[Cite as *State v. Jones*, 2020-Ohio-4915.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108894 |
| v. | : | |
| KELEND JONES, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 15, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-639321-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel Cleary, Assistant Prosecuting Attorney, *for appellee.*

Russell S. Bensing, *for appellant.*

PATRICIA ANN BLACKMON, P.J.:

{¶ 1} Kelend Jones ("Jones") appeals from his convictions for murder and attempted murder and assigns the following errors for our review:

I. The Appellant's conviction for the murder of Cortez Ruffin, and the attempted murders of Isaiah Richardson, Tauvarsion Waller, Gary Williams, Tyronne Laney, and Michael Johnson, were not supported by sufficient evidence.

II. The Appellant's conviction for the murder of Cortez Ruffin, and the attempted murders of Isaiah Richardson, Tauvarsion Waller, Gary Williams, Tyronne Laney, and Michael Johnson, were against the manifest weight of the evidence.

{¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's judgment, finding that Jones's convictions — as the principal offender or an accomplice — are supported by sufficient evidence and not against the manifest weight of the evidence. The apposite facts follow:

{¶ 3} On the night of July 25, 2018, and the early morning hours of July 26, 2018, local rapper Q Money filmed a music video at the Dog Pound Lounge, a bar located on St. Clair Avenue and E. 186th Street in Cleveland. Approximately 200 people gathered in the bar's parking lot for the event. Georgianna Rivers ("Rivers") was among those at the bar, and she got into a physical fight with her ex-boyfriend in the parking lot. After the altercation, Rivers recruited her cousin, Cortez Ruffin ("Ruffin"), for assistance. Rivers then engaged in a fistfight with a woman. Bystanders attempted to break up the fight between the two females. Ultimately, a man in a green shirt fired a gun multiple times shooting Ruffin. Jones then fired his gun multiple times into the melee. The unknown male in the green shirt and Jones ran from the scene while firing their guns, got into a van, and fired more shots. Ruffin eventually died from his gunshot wounds, and at least five other people at the scene were shot.

{¶ 4}   On August 20, 2018, Jones was charged in a 25-count indictment for crimes related to the shooting, including the murder of Ruffin and the attempted murder of the five other victims.  This case was dismissed, and on April 25, 2019, Jones was reindicted for the same counts with the addition of drive-by-shooting firearm specifications.  The case was tried before a jury[1] beginning on June 24, 2019.  Jones was found guilty of murder and felonious assault regarding Ruffin ("Ruffin"); attempted murder and felonious assault regarding Tyrone Laney ("Laney"), Michael Johnson ("Johnson"), and Isaiah Richardson ("Richardson"); attempted murder regarding Tauvarsion Waller ("Waller") and Gary Williams ("Williams"); two counts of discharging a firearm upon or over a public road; and one count of having a weapon while under disability.

{¶ 5}   On July 17, 2019, the court merged the felonious assault counts into the murder and attempted murder counts and sentenced Jones to life in prison with the possibility of parole after 29 years.  It is from these convictions that Jones now appeals.

**Sufficiency of the Evidence**

{¶ 6}   Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense.

---

[1] Twenty-four counts were tried to the jury.  The final count, having a weapon while under disability, was tried to the court.

Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 7} The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*, 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

## Manifest Weight of the Evidence

{¶ 8} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, & 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidences effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive then the state's or the defendant's? We went on to hold that

although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶ 9} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

## Murder and Attempted Murder

{¶ 10} Jones was convicted of one count of murder and five counts of attempted murder. Murder is defined in R.C. 2903.02 as "(A) No person shall purposely cause the death of another * * *." Attempt is defined in R.C. 2923.02 as "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶ 11} Jones argues under both assigned errors that the state "failed to produce any evidence to show that the Appellant shot Ruffin or any of the other alleged victims." We review Jones's assigned errors together.

## Trial Testimony

{¶ 12} The following testimony was presented at trial.

{¶ 13} Cleveland Police Officer Matthew Woznicki ("Officer Woznicki") testified that, at approximately 1:30 a.m. on July 26, 2018, he responded to a call of shots fired with several people injured in the area of the Dog Pound Lounge in Cleveland. Officer Woznicki testified that, when he arrived at the scene, there were "roughly close to 200" people present. Officer Woznicki "rendered aid" to Ruffin, who was "unresponsive at that time, laying on his back." According to Officer Woznicki, "[t]here was also another victim who was shot in the arm * * *." Officer Woznicki also "identified multiple shell casings in the parking lot and the street next to the Dog Pound * * *."

{¶ 14} Lisa Amill ("Amill") testified that she met two of her coworkers at the Dog Pound Lounge around 1:00 a.m. on July 26, 2018. She went into the bar for 10-15 minutes, then went back outside to the parking lot, which "was full of people." According to Amill, "some girls" got into an altercation, and at least one man tried to break up the fight when "shots rang out." She ducked behind a car, and "[e]verybody was screaming, running. You just heard a bunch of gunshots coming from a bunch of different angles." When the shots stopped, Amill saw "a man laying behind the car where I was actually ducking on the ground bleeding out." This man was the same one who Amill saw trying to break up the females who were fighting. Amill, who is a nurse, got a t-shirt from a bystander and applied pressure to the wounds on this man's chest and arm. By this time, "[e]verybody was panicking, crying, screaming [and] running around."

{¶ 15} As Amill was waiting for EMS to arrive, "all of a sudden you hear some more gunshots and people screaming. I looked back, saw people running towards me and heard more gunshots. So, everybody started disbursing. I rolled under the car and then I heard people screaming like, no, no, don't shoot him again. Don't shoot him again." Amill then heard more gunshots and screaming. Amill could not identify any of the shooters.

{¶ 16} Cleveland Police Detective Mark Peoples ("Detective Peoples") testified that he works in the crime scene unit, and he responded to the shooting at the Dog Pound Lounge on July 26, 2018. The crime scene consisted of the bar's parking lot as well as the streets of the intersection at St. Clair Avenue and East 186th Street, "because there was evidence located in the driveway by the garage [and] the back fence" of a nearby house. Detective Peoples "observed multiple spent shell casings, bullet defects to the building, blood stains on the ground, on the sidewalk, in the parking lot, and on East 186th Street. * * * There was a weapon that was recovered, it was a .9 millimeter [sic] * * * Taurus Millenium. * * * That was in the backyard of I think the first house right behind where the Dog Pound Lounge is."

{¶ 17} The cartridge casings Detective Peoples recovered from the crime scene were fired from the following types of handguns: a .380 caliber; a .40 caliber; and a 9 mm. Spent bullet casings were found on the street as far as four houses down from the bar. In total, the police collected 12 spent cartridges from the crime scene.

{¶ 18} Dr. Dan Galita testified that he performed the autopsy on Ruffin, who died at University Hospitals on August 1, 2018. Ruffin suffered four gunshot wounds

on July 26, 2018, in the parking lot of the Dog Pound Lounge — one on the right side of his back with an exit wound on his chest; two on his left arm, one of which passed through his chest; and one on his right thigh. Dr. Galita testified that three bullets entered Ruffin from the back as he was standing up, and one bullet entered Ruffin from the front. Dr. Galita testified that Ruffin's cause of death was "multiple gunshot wounds of trunk and extremities with visceral and soft tissue injuries." Dr. Galita further testified that there was no fouling or stippling on Ruffin's body, meaning that the gun was fired from more than three feet away.

{¶ 19} Richardson testified that Q Money is one of his family members, and Richardson was at the Dog Pound Lounge on the night of July 25, 2018, and into the morning of July 26, 2018, for the music video shoot. Richardson testified that after filming was complete, "the stuff popped off," meaning "[t]hat's when the shooting took place." Richardson heard gunshots, then "started taking off running." He got down behind a car that was parked across the street. "After that I got up. Shots started ringing out again. So, I end up coming across to this street in the backyard and then that's when I had got hit. That's when I got struck. * * * At the driveway, I'm stopping. I'm ducking. Next thing out of nowhere I could hear a gunshot. I'm struck in the leg."

{¶ 20} Richardson testified about the injuries he suffered as a result of the gunshot wound. "It pinched my artery. It broke my bone. I got a rod from my knee to my ankle, six screws and two plates in my leg." Richardson testified that he did not see anybody shooting or possessing a gun that night.

{¶ 21} Rivers testified that she was at the Dog Pound Lounge on "July 25th, going into July 26, 2018," for a "Q Money video shoot." According to Rivers, there were approximately 200 people in the parking lot. Rivers and Ruffin are cousins, and she saw him at the gathering. At some point that night, Rivers punched her ex-boyfriend, who she alleged owed her money. Rivers testified that Johnson was at the Dog Pound Lounge with "[h]is girlfriend, his brother, Kelend, and several other people." In court, Rivers identified "Kelend" as the defendant Jones. Rivers got Ruffin's help to try to talk to her ex-boyfriend and resolve the dispute. Rivers then got into a fistfight with her ex-boyfriend's new girlfriend. Ruffin and other males attempted to break up this fight.

{¶ 22} Rivers testified that a fight broke out between Jones, Ruffin, and "several others." Somebody knocked Jones to the ground and several people helped pick him up. Rivers saw "a guy in green shoot [Ruffin]." The man in green "was fat and he had on some shorts." Rivers testified that she did not know who this person was.

{¶ 23} According to Rivers, Jones was stumbling as he was helped up from the ground, and he began firing a gun. He was "[s]tanding across from us, but his gun had a red beam on it * * *" and he fired it "several" times. The man in green ultimately took off running, but Rivers did not see where he was headed. Jones ran off to the side of the building.

{¶ 24} Rivers heard more gunshots after Jones and the man in green ran away. Rivers testified about surveillance video taken from cameras located outside

of the Dog Pound Lounge on the night in question. One camera depicts Jones shaking hands with the man in green. Jones was wearing blue clothing. After the incident, Rivers gave the police Jones's name[2] and identified him from a photo array and the surveillance video as the man in blue clothing who fired his gun several times.

{¶ 25} Kristen Koeth, a forensic firearms examiner for the Cuyahoga County Medical Examiner's Office, testified that the lone bullet that remained lodged in Ruffin's body was fired from a .40 caliber weapon. Additionally, four cartridge casings recovered from the scene were fired from the same unknown 9 mm handgun, and it was not the Taurus firearm found on the ground and collected as evidence. Two cartridge casings recovered from the scene were fired from the same unknown .380 caliber handgun. Six cartridge casings recovered from the scene were fired from the same unknown .40 caliber handgun.

{¶ 26} Waller testified that he has known Jones since 2009 when they went to school together. Waller has seen Jones at the Dog Pound Lounge "about three times" since 2017. Waller testified that after the video wrapped, Rivers and another female got into an altercation. He was one of "a lot of people" who witnessed the fight. He was trying to break up this fight when he heard gunfire. He ran and took cover with Laney and Richardson. Waller was shot when a bullet grazed his left arm. Waller did not see who fired the gun.

---

[2] Rivers told the police that Jones's name was Kenneth, rather than Kelend. Rivers testified that she "didn't know the proper pronunciation of his name."

{¶ 27} According to Waller, Jones was at the Dog Pound Lounge that night, and he was wearing "jeans and a blue shirt." However, this testimony was in relation to the surveillance video footage that the state introduced at trial. Waller testified on cross-examination that he did not identify Jones to the police prior to the trial.

{¶ 28} Williams testified that he was at the Dog Pound Lounge on the night of July 25, 2018, for the Q Money video shoot. Williams grew up with Q Money, Rivers, and Ruffin. Williams saw Rivers and several other people get into two fights that night. After the second fight, Williams got shot in the stomach and the arm. The injury to his stomach required surgery. Williams testified that he did not know who shot him or how many shooters there were.

{¶ 29} Laney testified that he was at the Dog Pound Lounge on the night of July 25, 2018, for the Q Money video shoot. Laney is Waller's brother, and he also grew up with Q Money, Rivers, and Ruffin. Laney, Waller, and Ruffin saw an altercation between Rivers and another female, and they tried to break up the fight. After this, "[s]hots started going off." Laney was shot twice in the stomach and once in the back. Laney was in the hospital for two-and-a-half months as a result of being shot. He did not see who shot him.

{¶ 30} Cleveland Police Detective Donald Kopchak ("Detective Kopchak") testified that he has worked in the 5th District, which is the area of Cleveland in which the Dog Pound Lounge is located, for 13 years. He testified as follows about his familiarity with members of this community:

We do a lot of investigations. We get a lot of calls for complaints, where citizens give nicknames or descriptions, or where people hang out. It's important for us to be able to do those types of investigations based off minimal information such as nicknames, where people hang out, cars they drive, things of that nature.

Most people don't want to get involved too heavily so they'll give you a little bit of information, but with our background and knowing the area, we can pretty much go forward with that.

{¶ 31} Detective Kopchak testified that he knows Jones "[f]rom past experiences." Detective Kopchak watched the video surveillance footage from the Dog Pound Lounge on the night of the shooting to see if he was able to identify any of the people in the video. Detective Kopchak identified Jones as the "gentleman in the blue shirt with the jeans [and] some sort of flip-flops on."

{¶ 32} Cleveland Police Detective Michael Benz ("Detective Benz") testified that he has worked in the neighborhood of the 5th District for 25 years. He was involved in the investigation of the shooting at the Dog Pound Lounge. Detective Benz testified that he watched the owner of the Dog Pound Lounge transfer video footage from 16 surveillance cameras located at the bar to a flashdrive. The videos depicted what occurred on the night of July 25, 2018, starting at 11:00 p.m. into the early morning of July 26, 2018, at 2:00 a.m. Detective Benz viewed all the footage at least once and footage of the shooting several times. According to Detective Benz, two people were recorded on the video shooting guns.

The first shooter was wearing — he was a heavy set male, wearing a green — kind of a noticeable greet shirt. He had some khaki shorts on.

The second shooter was — he was pretty darkly clothed, but yeah, you could definitely tell the two people that were shooting.

* * *

Apparently, there's a fight — now you're going to see right there he's shooting the gun. [The second shooter is] not there yet. He's going to come right here. He's coming. He'll come around right now then shoot into the ground allegedly where that victim was laying.

* * *

You see everybody scatter then — that's the male in the green right there. * * * They go to a van that's parked right there on East 186th Street, which you can see from this other angle. * * * I don't know who he is. That's the first shooter though. * * * Those are the two shooters from the front. * * * Well, they initially jump into that van and then for some reason Michael Johnson comes up to them, they get back out, start shooting at him. As you see, he runs away when he was shot. * * * You can see the flash [from the gun] and then you can see right there more shooting down the street. * * * [The van] goes around the block, comes back, and then there's more shooting from the van. * * * These two males are walking up the driveway. The van will pull back up again and then you'll see some more shots out of the van.

{¶ 33} According to Detective Benz, the van first appeared on the video footage at 1:19 a.m. Detective Benz further testified that he did not know the identity of either shooter. Furthermore, "the male in the green" entered the passenger side of the van, and "the second shooter with the dark clothing on" drove the van.

{¶ 34} Approximately five or six days after the shooting, Detective Benz met Rivers at the police station to identify the two shooters seen in the video. Rivers described the shooters as a "heavyset male in the green and the taller male who she thought was the name — his name was Kenneth at the time." According to Detective Benz, Rivers

pulled up her social media Instagram and pulled up a picture of a male. I think his name was Check Cashin' K on Instagram and there was only one photo of him on there, but that's the — I just made a copy or printed out that photo. * * * I had that picture. I asked around. I asked other

officers in our district. Eventually I was given information on Kelend Jones.

I then ran Kelend Jones through OHLEG, the Ohio law enforcement website where your driver's license pictures and stuff would be. I pulled up his OHLEG picture and * * * he matched the picture.

* * *

After getting ahold of this picture, I made a six-pack lineup with five other males. * * * Sergeant McCaulley met with Georgiana Rivers, showed her the lineup, and she chose Kelend Jones as the second shooter.

{¶ 35} Detective Benz also learned that Jones was known to drive a "silver-ish blue minivan." Detective Benz spoke with people in the neighborhood and secured pictures of Jones and a silver-blue Honda Odyssey minivan at a local gas station.

{¶ 36} Johnson testified that he was at the Dog Pound Lounge on the night of July 25, 2018, for the Q Money video shoot. He saw the fight between Rivers and another female. Asked what happened after the fight, Johnson replied, "Guys shot." Johnson tried to "duck for cover to see where the gunshots was coming from." Johnson testified that he ended up on a brick side street near a dumpster. He bumped into a "dude" who started firing at him. Johnson was shot in the arm by a dark-skinned man wearing burgundy. Johnson did not know who this man was.

{¶ 37} Cleveland Police Detective Arthur Echols ("Detective Echols") testified that he has been a police officer for 30 years and a homicide detective for 11 years. He was assigned to investigate Ruffin's death on August 2, 2018. This case was originally assigned to another department within the Cleveland Police, and when

Ruffin passed away from his injuries, Detective Echols took over. At that time, Jones had already been identified as one of the suspects in the shooting. Detective Echols reviewed the case details, including the surveillance video, and interviewed witnesses, although he "received very little cooperation from the six[3] living victims in this case."

{¶ 38} Detective Echols identified Jones, who was wearing "a dark t-shirt," in the surveillance videos, along with a "male in the green shirt and khaki pants." The identification of Jones was based on his height, his face, and "a certain body stature." At the time of trial, the male in green had not been identified, although the police had developed two suspects. Detective Echols testified as follows about what he saw on the video: "It appears that Mr. Jones, who is walking in an easterly direction on the sidewalk, appears to be pointing or waving a gun towards these lights and the group of people that are right here." Det. Echols testified that the video showed "shots * * * being fired right now by the male in the green shirt and khaki pants." He also testified that .40 caliber shell casings were recovered from that area of the parking lot. Detective Echols continued:

> A: You just saw the male in green run. You see another male who I previously identified as Kelend Jones walking down the sidewalk. He fires at least one shot.
>
> Q: Can you see the flash?
>
> A: Yes.

---

[3] A sixth victim of the shooting was identified, although Jones was not charged with any offenses related to this victim.

Q.      Again, the same question here. Reviewing crime scene photos as well as watching this video, were there any shell casings located where you testified Kelend Jones fired that shot?

A.      Yes.

Q.      What type of shell casings?

A.      It was a .9 millimeter [sic] fired ammunition cartridge recovered from that area.

Q.      Where do these gentlemen go * * *? In what direction do they travel?

A.      They travel, as you saw, on the sidewalk east along the front of the bar. From there they go north — I'm sorry, south, which is around the corner of the bar to the eastern end of the bar or the building.

Q.      Detective, * * * [w]hat angle are we looking at here?

A.      You're looking at from the top of the building or near the top of the building down towards East 186th Street. This is an eastern view from the building or the structure known as The Dog Pound.

* * *

Q.      Do you know who this gentleman is in the middle?

A.      That person is Michael Johnson.

Q.      Okay. Do you know who this gentleman is up on top?

A.      That is the male in the green.

Q.      Okay. What does he do?

A.      The male in the green fires three shots southbound and there was a shot fired or two shots fired at Michael Johnson as well.

* * *

Q.      Well, is there another male out there with the male in the green while Michael Johnson is being shot at?

A.      Yes.

Q. Where does that male go?

A. That male goes to the driver's side of this van here.

Q. What's the guy in the green doing right there?

* * *

A. He fires at least three shots in the southerly direction, then he gets into the front passenger's seat of the van.

Q. Question for you. When the van pulls away, is that second guy still standing there?

A. No.

Q. The second guy is gone?

A. Yes.

Q. Did anybody else that you saw from this video go to the driver's side of that van?

A. No.

Q. Do you know what that van does?

A. It leaves. Then moments later it comes back.

A: You see two males now walking up a driveway, which is the — they just took cover and now they're running away from the scene.

Q. This male I'm pointing at here, how would you describe his actions?

A. He is injured because he's hopping away.

Q. Do you know who that is?

A. That is Isaiah Richardson.

## Analysis

{¶ 39} On appeal, Jones concedes he was at the Dog Pound Lounge on the night of the shooting and he fired shots. However, Jones argues that the state failed

"to demonstrate not only that Jones shot the named victims of the attempted murders, but that he killed Cortez Ruffin." To support this, Jones argues that there is no forensic evidence linking him to the shootings. Specifically, Jones points to the lack of DNA and ballistics evidence. Upon review, we find that Ohio law does not require forensic evidence to sustain a conviction. "This court has long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990).

{¶ 40} Jones next argues that the surveillance video did not establish that he shot anyone. The video shows Jones and the man in green talking as if they knew each other. It shows the man in green fire several shots into the crowd. It shows Jones standing near the man in green also firing a gun. It shows Jones and the man in green run away from the scene and get in a van together — Jones in the driver's seat and the man in green in the passenger's seat. As the van drives away, the video shows gunfire coming from the front passenger window where the man in green was sitting.

{¶ 41} The court instructed the jury that Jones was complicit with the man in the green shirt as follows:

> Aiding and abetting is when two or more persons have a common purpose to commit a crime, when one does one part and the other person performs the other part. As to an aider and abettor only, the mere fact that a person is present when a criminal act is committed does not make him or her an aider and abettor unless he or she does some overt act in furtherance of the crime charged in the indictment. Aid means to help, assist, or strengthen. Abet means to encourage,

counsel, incite, or assist. An overt act means any conduct when it is of such character as to manifest a purpose on the part of the actor that the crime charged be committed.

* * *

Now, no person acting with the kind of culpability required for the commission of an offense shall aid or abet another in committing the offense. That's the gist of this aider and abettor that I've given to you. It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.

{¶ 42} Shell casings from three guns were found at the scene of the shooting. It is not known who fired the fatal shots at Ruffin or the shots that injured the other five named victims. However, "the identity of the principal is not an element that the state must prove to establish the offense of complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2)." *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 14. "When an individual acts to aid or abet a principal in the commission of an offense, the individual and principal are equally guilty and the individual is prosecuted and punished as if he were a principal offender." *State v. Shabazz*, 146 Ohio St.3d 404, 2016-Ohio-1055, 57 N.E.3d 1119, ¶ 21.

{¶ 43} Rivers testified that she saw Jones fire a gun at the melee. Detective Benz identified a "second shooter" in the video, and Rivers identified this shooter as Jones. Additionally, Detective Echols identified Jones as the second shooter in the video. As stated earlier in this opinion, Jones conceded that he fired a gun at the video shoot.

{¶ 44} As to Ruffin's murder, the autopsy showed that the cause of death was multiple gunshot wounds. Evidence was presented that the man in green and Jones

fired guns that night. It is not known, however, which one of them fired the fatal shot or shots. This court has held that "[i]n Ohio, there is no difference between those convicted of complicity in a crime or as a principal offender." *State v. Crosby*, 8th Dist. Cuyahoga No. 106504, 2018-Ohio-3793, ¶ 9. *See also State v. Walton*, 8th Dist. Cuyahoga No. 88358, 2007-Ohio-5070 (finding no error with the state's decision to pursue alternate theories of defendant being the principal offender or an aider and abettor in his murder trial). Additionally, the evidence shows that Jones and the man in green knew each other, fired guns at the same time, ran away from the scene together, and fled in a van with Jones driving and the man in green still shooting his gun from the passenger window. Accordingly, we find that Jones could have been convicted of this murder as either the principal offender or an aider and abettor.

{¶ 45} The same logic applies to the attempted murder convictions. Firing a gun into a crowd is sufficient to sustain an attempted murder conviction. *See, e.g., State v. Pryor*, 8th Dist. Cuyahoga No. 55454, 1989 Ohio App. LEXIS 2236 (June 8, 1989) (attempted murder conviction upheld based on testimony that "defendant raised the rifle over the dumpster and pointed it directly into the crowd of boys running toward" him). The evidence presented at trial supports Jones's attempted murder convictions under a principal offender theory.

{¶ 46} Furthermore, Ohio courts have consistently held that evidence showing a defendant aided and abetted the shooter is sufficient to support a conviction for attempted murder. *See State v. Widner*, 69 Ohio St.2d 267, 431 N.E.2d 1025 (1982) (upholding conviction for attempted murder under an aiding and

abetting theory); *State v. Brooks*, 8th Dist. Cuyahoga No. 102551, 2016-Ohio-489, ¶ 35 ("Although the physical evidence did not demonstrate that Brooks was the shooter, there was sufficient evidence that he aided and abetted the shooter"); *State v. Garner,* 10th Dist. Franklin No. 07AP-474, 2008-Ohio-944, ¶ 21 ("The mere act of driving away from the scene of a shooting perpetrated by a passenger of a vehicle has been held to be sufficient to upon a conviction based on complicity where the circumstances show the driver knew shots were being fired by the passenger.").

{¶ 47} In *State v. Jenkins*, 8th Dist. Cuyahoga No. 105881, 2018-Ohio-2394, ¶ 51, this court rejected a defendant's argument that his attempted murder conviction should be overturned "because there was no evidence that [he] targeted anyone" when he fired his gun. The court held as follows: "The state presented evidence that Jenkins pointed a gun out of a moving vehicle toward a crowd of 20 people and fired the gun multiple times. * * * That evidence is sufficient to show that Jenkins knew that his conduct would probably cause harm and possible death to one or more people in that crowd." *Id.*

{¶ 48} Viewing this evidence in a light most favorable to the state, as we must, we hold that the trial testimony and surveillance video footage is sufficient for a rational trier of fact to find Jones guilty of murder and attempted murder under either a principal offender theory or an accomplice theory. We further find that, after reviewing the record, including the credibility of the witnesses, the jury did not lose its way and create a manifest miscarriage of justice. Jones's convictions are not

against the manifest weight of the evidence. Accordingly, Jones's first and second assigned errors are overruled.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, PRESIDING JUDGE

MICHELLE J. SHEEHAN, J., and
RAYMOND C. HEADEN, J., CONCUR