[Cite as *State v. Skanes*, 2025-Ohio-4462.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                         :

    Plaintiff-Appellee,          :

                         No. 114528

    v.                                   :

JAMAR SKANES,                          :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 25, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-692857-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee*.

Philip J. Korey, *for appellant*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant Jamar Skanes challenges the judgment of the Cuyahoga County Court of Common Pleas, assigning three errors for our review:

> 1. The trial court erred to the prejudice of the appellant when [it] overruled the motion to suppress oral statements in violation of

appellant's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

2. The police should have secured an arrest warrant before questioning Jamar Skanes in violation of his Fourth and Fourteenth Amendment rights, Article 1, Section 14 of the Ohio Constitution, and Ohio Rule of Criminal Procedure 52(B).

3. The trial court committed prejudicial error when it overruled the motion for acquittal and proceeded to find appellant guilty in violation of appellant's rights as guaranteed under the Fourteenth Amendment to the United States Constitution.

{¶ 2} After a thorough review of the applicable law and facts, we affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 3} This case arises from the shooting death of Alyson Appling-France ("the victim"). On January 10, 2024, the victim's two children, ages six and nine, were picked up at 8:30 a.m. from their residence by a man that the victim had been paying to drive her and her children around in his minivan. The children were being driven to school that morning. Surveillance video of the parking lot of the victim's apartment complex on Detroit Avenue in Cleveland showed the two children stepping into the minivan. Approximately one hour later, the video shows a black Ford pickup truck driving into the parking lot of the victim's apartment complex and parking along the driveway.

{¶ 4} The Ford truck left and reentered the parking lot several times throughout the day, each time parking in the same location. During one of the times that it left, around 4:00 p.m., the Ford truck was captured on video at a gas station.

The video showed that there were two occupants in the vehicle. Each of the occupants went inside the gas station, and video from inside the gas station showed their faces. The occupants of the vehicle were subsequently identified as Skanes and co-defendant Alontez Beasley ("Beasley"). It was later learned that Skanes and Beasley were cousins. Skanes pumped the gas into the Ford truck and paid for it.

{¶ 5} The Ford truck returned to the victim's apartment complex parking lot at 4:49 p.m. At 5:08 p.m., a white GMC Acadia drove past the parking lot. At that same time, Beasley sent a text message to an individual named Clarence Bennett ("Bennett"), who is also a cousin of Beasley, that said, "I see you." (Tr. 680.) Bennett responded, "Yup." (*Id.*) The Acadia then parked on the street and waited.

{¶ 6} Later, the minivan came back to the apartment complex to return the girls from school. After the girls exited the minivan and went into their residence, the driver waited, and then the victim and her children came outside and got in the minivan. They rode in the minivan to a nearby Target. The Acadia and the Ford truck followed them and parked in the Target parking lot.

{¶ 7} The victim and her children went inside Target and later went into Giant Eagle, which shared a parking lot with Target. While they were inside, the Acadia went to a GetGo gas station in the same shopping plaza and was captured on surveillance video there. The driver of the Acadia was eventually identified by police as Bennett. He returned to the Target parking lot after getting gas.

{¶ 8} The victim and her children left the grocery store and returned to the apartment complex in the minivan. The Ford truck also returned to the parking lot of the apartment complex.

{¶ 9} At 8:08 p.m., the victim was seen on video unloading groceries from the minivan. An individual ran up to where she was. When the victim saw him, she dove into the minivan. He placed a hand on the window of the minivan's sliding door, reached into the minivan, and fired 17 rounds into the victim. The victim's two daughters were still in the backseat. The shooter got back into the Ford truck and drove away. The minivan drove away with the sliding door still open.

{¶ 10} Approximately two weeks later, Cleveland Police executed search warrants at Beasley's, Skanes's, and Bennett's residences. The Ford truck was located at Skanes's house, along with the sweatshirt that Beasley had been seen wearing on the gas station surveillance video. Beasley's DNA was found on the part of the minivan window where the shooter had placed his hand. The Acadia was later located and determined to belong to Bennett.

{¶ 11} While the search warrant was being executed at Skanes's residence, Skanes was placed under arrest and handcuffed. At this time, while still at his residence, Det. Stephen Loomis ("Det. Loomis") interviewed Skanes, which was recorded on his body camera. When asked if he had ever been on the West Side of Cleveland in a black truck, Skanes said no. However, when Det. Loomis showed Skanes a picture of himself at the gas station, Skanes admitted that that was him. He told Det. Loomis that Beasley had come to his house to get him that morning and

that Beasley had said they were going to see one of Beasley's friends in a high-rise apartment.

{¶ 12} Skanes further stated that Beasley had returned him back at his home that same day and had left his truck in Skanes's locked garage ever since. Skanes maintained that he was asleep for most of the time that he was in Beasley's truck and only woke up when they were on the way home.

{¶ 13} After the interview with Det. Loomis, Skanes was taken to the police station and made an additional statement there.

{¶ 14} Beasley was also arrested on the day the search warrants were executed. His cellphone was seized and extracted by police. The extraction revealed text messages sent on January 5, 2024, between Bennett and Beasley where Bennett told Beasley, "We need to tonight." (Tr. 706.) On that night, the Acadia and Ford truck were seen on surveillance footage at the victim's apartment complex. Beasley's phone registered at the GPS location of the apartment complex as well. Two days later, Bennett texted Beasley, "My N wanting to know what and why it didn't happen." (Tr. 707.)

{¶ 15} Beasley's cellphone extraction also revealed a two-hour-and-45-minute FaceTime call took place between Bennett and Beasley at 5:18 p.m. on the day of the shooting.

{¶ 16} Skanes, Beasley, and Bennett were jointly indicted. The charges relating to Skanes were aggravated murder, in violation of R.C. 2903.01(A); conspiracy to commit murder, in violation of R.C. 2923.01(A)(2); two counts of

murder, in violation of R.C. 2903.02(A) and (B); and five counts of felonious assault, in violation of R.C. 2903.11(A)(1) and (A)(2). The charges had accompanying three- and six-year firearm specifications.

{¶ 17} Skanes and Beasley were tried together in a joint trial; Skanes waived his right to a jury and was tried to the bench, while Beasley was tried by the jury.[1] The State presented the testimony of 17 witnesses and offered 875 exhibits.

{¶ 18} During the State's case-in-chief, Skanes filed a motion to suppress statements he made to the police. In his motion, Skanes argued that his waiver of his *Miranda* rights was not voluntary or intelligent because it pertained to the statements he made during his interview at the police station.

{¶ 19} The court allowed counsel to present arguments on the motion, and the State averred that it was not going to offer Skanes's third interview at the police station as evidence. Defense counsel acknowledged that some of his objection was therefore alleviated but asserted that Skanes should have been re-Mirandized between the first and second statements taken at his residence. The State explained that Skanes had been Mirandized prior to his first statement, which was on tape and began at 7:49 a.m. After approximately 15 minutes, there was a short break, and then Skanes gave a second statement at 8:18 a.m. Defense counsel conceded that Skanes was properly Mirandized prior to his first statement but objected to the second because Skanes was not Mirandized a subsequent time.

---

[1] An arrest warrant had been issued for Bennett, but as of the time of trial, he remained at large. (Tr. 707.)

{¶ 20} The court noted that the time between the statements was very brief and determined that the police were therefore not required to readminister Miranda warnings. The motion to suppress was denied, and the case continued.

{¶ 21} Tom Ciula ("Ciula") provided expert testimony regarding video forensics. He testified that he had accompanied detectives to collect video evidence from five different locations on the West Side of Cleveland. Detectives also gave him two other videos that they had collected from the victim's apartment complex and a neighboring apartment complex. Ciula testified regarding State's exhibit No. 629, which was video of the parking lot at the victim's apartment complex and depicted the shooting. State's exhibit No. 630 was an enlargement of the video in State's exhibit No. 629 that Ciula had created.

{¶ 22} In State's exhibit No. 630, the victim can be seen exiting the passenger-side sliding door of the minivan. The victim's two children are visible in the third row of the minivan. The shooter is seen running up to the minivan, bracing himself with his hand on the window of the open sliding door, and shooting into the minivan where the victim had jumped back inside.

{¶ 23} Ciula also testified regarding State's exhibit No. 631, a video that showed the minivan leaving the apartment complex following the shooting with its passenger-side sliding door open. The Ford truck was seen speeding in the same direction and going around the minivan after it stopped and then turning right. State's exhibit No. 632 was an enlargement of State's exhibit No. 631. The open

sliding door of the minivan can be seen more easily, along with the fact that there were two individuals in the Ford truck.

{¶ 24} The victim's neighbor testified that she had seen the Ford truck earlier in the day in the apartment complex parking lot. When showed State's exhibit No. 629, she identified her vehicle and her husband's vehicle parked where the minivan pulled up. She testified that she and her husband were home that night and heard what sounded like a "barrage of gunfire." (Tr. 90.) Her husband called 911. She looked out the window and saw the minivan and the Ford truck leaving the apartment complex. She further testified that earlier on the day of the shooting, she had observed a big black truck with a muffler that sounded very loud. (Tr. 94.) She stated that the truck seen leaving the apartment complex "look[ed] like" the truck she had seen earlier in the day. (Tr. 98.)

{¶ 25} Det. Loomis testified about the investigation of the shooting and, in particular, his interview with Skanes on the day of the execution of the search warrant. The video of Skanes's interview was played for the court, outside of the presence of the jury. (State's exhibit Nos. 901 and 902.) As noted above, in the interview, Skanes initially denied that he had ever been on the West Side of Cleveland in the Ford truck. Upon seeing his own photograph at the gas station, Skanes admitted that he was with Beasley on the West Side of Cleveland. He stated that Beasley had picked him up to go to his "buddy's house" in a high-rise apartment. (*Id*.) Skanes maintained throughout the interview that he was asleep most of the

time he was in Beasley's truck and only woke up when they were heading back to Skanes's residence. (*Id.*)

{¶ 26} A tow-truck driver who had regularly driven through the victim's apartment complex, and had done so on the day of the shooting, testified that he saw a black pickup truck parked facing Detroit Avenue that was not in a parking spot but was parked in a place where "usually no one parks . . . ." (Tr. 237-238.) He stated that he had seen the truck parked there on two afternoons. (Tr. 238.) He testified that it looked like there were two people in the truck, "leaning back . . . taking a break." (Tr. 238-239.)

{¶ 27} The tow-truck driver testified that after he learned of the shooting, he wondered if the truck had had anything to do with it and told his boss that he had seen the truck sitting there. (Tr. 240.) He stated that he believed that the truck might have been seen on the dashcam of one of their other tow trucks.

{¶ 28} State's exhibit No. 815 was video from the dashcam of a tow truck entering the driveway of the apartment complex. State's exhibit No. 816 was another video from the dashcam of the same tow truck. This video was captured less than 20 minutes later while the truck was traveling in the opposite direction and heading out of the driveway of the apartment complex. In both videos, the Ford truck is seen parked along the driveway facing Detroit Avenue, not in a parking space. The tow-truck driver testified that that was the same position in which he had previously seen the truck.

{¶ 29} The State also presented the testimony of the officers and detectives who processed the crime scene and collected evidence; the 911 dispatcher; the medical examiner who conducted the autopsy examination of the victim; the civilian analyst with the Cleveland Police Department who examined the City of Cleveland's Real-Time Crime Center camera system and located videos of the minivan, the Ford truck, and the Acadia on the day of the shooting and who also analyzed videos from the gas station; the forensic scientists who performed the DNA and trace evidence testing; and the ballistics expert.

{¶ 30} At the close of the State's case, Skanes moved for a Crim.R. 29 judgment of acquittal. He argued generally that the State had not presented sufficient evidence of any of the charges and that the only real evidence was that Skanes was sitting in his vehicle. He also specifically argued that the State had not presented any evidence that there was any physical harm caused to Jane Doe One, Jane Doe Two, or John Doe, who were the victim's children and the driver of the minivan. The court denied the motion.

{¶ 31} Skanes did not present any testimony or other evidence and renewed his Crim.R. 29 motion, which was again denied.

{¶ 32} The jury returned a verdict against Beasley, finding him guilty of all counts and specifications. After the jury was excused, the court rendered its verdict against Skanes, finding him guilty of all counts and specifications.

{¶ 33} The court held a joint sentencing hearing for Beasley and Skanes and sentenced them both to life without the possibility of parole, plus nine years for the firearm specifications.

{¶ 34} Skanes then filed the instant appeal.

## II. Law and Analysis

## A. Motion to Suppress

{¶ 35} In his first assignment of error, Skanes argues that the trial court erred in denying his motion to suppress. He contends that the oral statements made to police should have been excluded because they were not made intelligently or voluntarily.

{¶ 36} Skanes's motion to suppress was filed during the State's case-in-chief. The motion acknowledged that Skanes had been Mirandized prior to the questioning at his house but asserted that he had not been Mirandized when he was questioned by a different detective after he had been taken to the police station.

{¶ 37} During a recess in the trial, the court heard arguments from counsel and considered the motion. The State noted that it was not going to play Skanes's statement at the police station during the trial and would only offer the statements made at Skanes's residence. Defense counsel acknowledged that this would alleviate his objection to the third statement but maintained that Skanes should have been re-Mirandized prior to giving the second statement at his house.

{¶ 38} As noted above, the trial court denied the motion, finding that very little time had passed between the two statements made at Skanes's residence and therefore, he was not required to be re-Mirandized.

{¶ 39} On appeal, Skanes has changed tactics and now returns to the original argument in his motion — that the waiver of his *Miranda* rights was not intelligently or voluntarily made. He asserted in his motion that his waiver was not made voluntarily because he was originally Mirandized at his residence, but when he made the statement at the police station, he was not re-Mirandized and, given the environment of the police station as compared to his residence, his statement could not have been voluntary. However, while Skanes did raise this issue in his motion, he abandoned any argument regarding the voluntariness of his statements at the time the court heard the motion and therefore, such arguments were not considered by the trial court. Consequently, he has also abandoned this argument for purposes of appeal. As stated by the First District:

> Where a party abandons an issue by not addressing it before the trial court, the party invites any error from the trial court not addressing that issue. *See State v. Ulmer*, 1st Dist. Hamilton Nos. C-190304, C-190305 and C-190306, 2020-Ohio-4689, ¶ 15. Because the party that abandoned the issue invited the trial court's error, a party cannot revive his or her abandoned argument on appeal. *See id*., citing *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, ¶ 27 (discussing the doctrine of invited error), and *State v. Robinson*, 4th Dist. Washington No. 16CA22, 2017-Ohio-8273, ¶ 32 (a defendant who abandons a claim raised in his motion to suppress waives even plain-error review on appeal).

*State v. Acklin*, 2024-Ohio-1762, ¶ 16 (1st Dist.).

{¶ 40} Accordingly, Skanes waived the argument that his statement was not intelligently or voluntarily made for purposes of this appeal by abandoning it in the trial court. Skanes's first assignment of error is overruled.

### B. Arrest Warrant

{¶ 41} In his second assignment of error, Skanes argues that the police should have secured an arrest warrant before questioning him.

{¶ 42} Skanes's argument relates only to the police officer's actions; Skanes does not identify any mistake made by the trial court that we may review. Pursuant to App.R. 12(A)(1)(b), this court is to "[d]etermine the appeal on its merits on the assignments of error set forth in the briefs under App.R. 16 . . . ." "[A]ssignments of error should designate specific rulings which the appellant challenges on appeal. They may dispute the final judgment itself or other procedural events in the trial court." *N. Coast Cookies, Inc. v. Sweet Temptations, Inc.*, 16 Ohio App.3d 342, 343 (8th Dist. 1984); *see also Bradley v. Bradley*, 2021-Ohio-2514, ¶ 23 (8th Dist.).

{¶ 43} Because Skanes's second assigned error does not relate to any specific ruling or action by the trial court, we summarily overrule this assignment of error.

### C. Motion for Acquittal

{¶ 44} In Skanes's final assignment of error, he argues that the trial court erred in denying his motion for acquittal because the State failed to produce sufficient evidence to support his convictions. Specifically, Skanes argues that (1) no DNA linked him to the crime; (2) no fingerprints linked him to the crime; (3) he committed no overt act in furtherance of the crime; (4) he was approximately 75 feet

from the victim at the time of the shooting and remained in his seat in the vehicle during the shooting; (5) the detective originally thought he was a witness; (6) there was no evidence supporting complicity; and (7) he was unequivocally not the shooter. He ultimately concludes that the State failed to prove that he was an aider and abettor in the aggravated murder of the victim.

{¶ 45} Crim.R. 29(A) provides that a court "shall order the entry of a judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses. . . ." A Crim.R. 29 motion questions the sufficiency of the evidence, and we apply the same standard of review to a trial court's ruling on a Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial. *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

{¶ 46} "'[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed,' would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. McQuisition*, 2024-Ohio-3011, ¶ 25 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *id.* at paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain

a verdict is a question of law.'" *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 47} Preliminarily, we note that this assignment of error is stated very generally and could apply to all of the offenses of which Skanes was convicted. However, the arguments supporting the assigned error relate solely to the aggravated-murder charge; there are no arguments specific to the other charges of which Skanes was convicted. Because we are mindful of the party-presentation principle, we will only consider this assignment of error as it relates to the aggravated-murder conviction. *See Snyder v. Old World Classics, L.L.C.*, 2025-Ohio-1875, ¶ 4 ("Under the principle of party presentation, 'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'"), citing *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *see also State v. Quarterman*, 140 Ohio St.3d 464, 469 (2014) ("We are not obligated to search the record or formulate legal arguments on behalf of the parties, because '"appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them."'"), quoting *State v. Bodyke,* 2010-Ohio-2424, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part), quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

{¶ 48} The State's theory of the case was that Skanes aided and abetted Beasley in the shooting. Ohio's complicity statute, R.C. 2923.03, provides as follows:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of [R.C. 2923.01];

(4) Cause an innocent or irresponsible person to commit the offense.

. . .

{¶ 49} "When an individual acts to aid or abet a principal in the commission of an offense, the individual and principal are equally guilty and the individual is prosecuted and punished as if he were a principal offender." *State v. Shabazz*, 2016-Ohio-1055, ¶ 21, citing R.C. 2923.03(F). To support a conviction based upon complicity by "aiding and abetting" another, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. As this court has stated:

> "In order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense. *State v. Sims*, 10 Ohio App.3d 56, 10 Ohio B. 65, 460 N.E.2d 672 ([8th Dist.]1983). 'The mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.'" *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). . . ."

*State v. Howard*, 2012-Ohio-3459, ¶ 23 (8th Dist.), quoting *State v. Langford*, 2004-Ohio-3733, ¶ 20 (8th Dist.).

{¶ 50} Aiding and abetting may be shown by direct or circumstantial evidence, and a defendant's participation may be inferred from the defendant's presence, companionship, and conduct before and after the offense is committed. *Id.*, citing *id.* at ¶ 21, citing *State v. Cartellone*, 3 Ohio App.3d 145, 150 (8th Dist. 1981), citing *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971).  A defendant may aid or abet another by his words, deeds, gestures, or actions.  *State v. Capp*, 2016-Ohio-295, ¶ 25 (8th Dist.).

{¶ 51} Moreover, "[i]t is well settled that an unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider and abettor status." *Howard* at ¶ 24, quoting *State v. Porch*, 1994 Ohio App. LEXIS 1936, *11 (8th Dist. May 5, 1994), citing *State v. Chapman*, 21 Ohio St.3d 41 (1986).  "In such a case, the actions of the principal are imputed to the accomplice, and the accomplice may be found to have committed every element of the offense committed by the principal, including possession of the weapon."  *State v. Humphries*, 2014-Ohio-1230, ¶ 18 (8th Dist.), citing *State v. Frost*, 2005-Ohio-5510 (2d Dist.), and *State v. Alexander*, 2013-Ohio-2533 (8th Dist.).

{¶ 52} Viewing the evidence in a light most favorable to the State, we find that any rational trier of fact could have found the essential elements of aggravated murder proven beyond a reasonable doubt.  Skanes's participation in the crime can be inferred from his actions on the day of the shooting.  Skanes admitted that Beasley had come to his house to get him on the morning of the shooting and admitted that he was in the Ford truck during the shooting.  Skanes was further seen

on the surveillance video at the gas station in the afternoon that day where he pumped and paid for gasoline for the Ford truck. Consequently, it can be inferred that Skanes stayed with Beasley for over ten hours while they surveilled the parking lot of the victim's apartment, followed her to Target, and then followed her back to her home, where the murder ultimately occurred.

{¶ 53} Additionally, the Ford truck was left in Skanes's locked garage for over two weeks after the shooting, and clothing worn by Beasley the day of the shooting was found at Skanes's residence.

{¶ 54} The court viewed Skanes's interview with police that occurred on January 26, 2024, following the execution of the search warrant of Skanes's residence. Skanes initially lied to police in his interview and stated that he had never been on the West Side of Cleveland in the Ford truck. Once Det. Loomis showed him a picture of himself pumping gas into the truck at a gas station on the West Side of Cleveland, he admitted that Beasley had gotten him early in the morning on the day of the shooting. He claimed that he had fallen asleep in the car and essentially did not wake up until they got back to his house.

{¶ 55} Skanes later changed his story to say that he went with Beasley to visit his "buddy's house" in a "high rise" on the West Side of Cleveland. (State's exhibit No. 901.) Beasley told him that he was "waiting on his buddy to pull up." (*Id.*) Skanes did not recall when they left but that it was dark when he woke up and they were on the freeway. He later said that he woke up when Beasley "jump[ed] back in the car" and then "sped off, almost hit somebody in front of [them]." (*Id.*) He also

stated that they drove around a car that stopped and then they turned right. He did not recall what kind of vehicle the stopped car was. Skanes stated that he never asked Beasley what was going on and that he did not hear anything because he was asleep. He denied being in the apartment complex earlier and said that it was his first time riding with Beasley.

{¶ 56} Skanes said that when they got back to the house, Beasley parked the truck in the garage. Skanes then went in the house, and Beasley got a ride home from another individual. Skanes stated that the truck had remained in his garage since then.

{¶ 57} With regard to the lack of DNA or fingerprints linking him to the crime, we note that Ohio law does not require forensic evidence to sustain a conviction. "'This court has long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Jones*, 2020-Ohio-4915, ¶ 39 (8th Dist.), quoting *State v. Heinish*, 50 Ohio St.3d 231, 238 (1990).

{¶ 58} "While the circumstantial evidence certainly required the [trier of fact] to draw inferences in order to reach its conclusions, murder convictions . . . can rest solely on circumstantial evidence." *State v. Pudelski*, 2001 Ohio App. LEXIS 1150, *11-12 (8th Dist. Mar. 15, 2001), citing *State v. Lott*, 51 Ohio St.3d 160, 167 (1990). "[I]nferences cannot be built on inferences, [but] several conclusions can be drawn from the same set of facts; and a series of facts and circumstances can be used

as a basis for ultimate findings." *Lott* at 168, citing *Hurt v. Rogers Transp. Co.*, 164 Ohio St. 329 (1955).

{¶ 59} We find that there was sufficient evidence presented to show that Skanes acted in complicity with Beasley in committing aggravated murder, and the trial court did not err in denying his Crim.R. 29 motion for acquittal.

{¶ 60} Finally, we note that Skanes's third assignment of error also contends that the trial court erred in finding him guilty of the charges. We interpret this assertion to be raising a manifest weight of the evidence argument; however, Skanes does not make a specific argument as to why his convictions were against the manifest weight of the evidence. "A claim that a conviction is against the manifest weight of the evidence is qualitatively different from a claim that a conviction is not supported by sufficient evidence." *State v. Sparent*, 2012-Ohio-586, ¶ 11 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. As such, it is not proper to combine sufficiency and manifest weight arguments in one assignment of error. *See State v. Vicente-Colon*, 2010-Ohio-6242, ¶ 20 (9th Dist.).

{¶ 61} Furthermore, App.R. 16(A) requires a party to argue each assignment of error separately. *Cleveland v. Taylor*, 2021-Ohio-584, ¶ 87 (8th Dist.). "Pursuant to App.R. 12(A)(2), an appellate court may disregard any assignment of error, or portion thereof, if the appellant fails to make a separate argument." *Id.*, citing *State v. Wells*, 2013-Ohio-3722, ¶ 55 (8th Dist.).

{¶ 62} "'"It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record."'" *State v. Jones*, 2020-Ohio-3367, ¶ 68 (8th Dist.), quoting *State v. Moore*, 2019-Ohio-3705, ¶ 84 (6th Dist.), quoting *State v. Taylor*, 1999 Ohio App. LEXIS 397, *3 (9th Dist. Feb. 9, 1999); *see also State v. Collins*, 2008-Ohio-2363, ¶ 91 (8th Dist.) ("[I]t is not the duty of this Court to develop an argument in support of an assignment of error if one exists. . . . [T]his court may disregard arguments if the appellant fails to identify the relevant portions of the record from which the errors are based."), quoting *State v. Franklin*, 2006-Ohio-4569, ¶ 19 (9th Dist.).

{¶ 63} Because Skanes failed to separately argue that his convictions were against the manifest weight of the evidence, we will disregard this portion of his third assignment of error.

{¶ 64} Skanes's third assignment of error is overruled.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, A.J., and
MARY J. BOYLE, J., CONCUR