[Cite as *State v. Marshall*, 2023-Ohio-3542.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-22-1207

    Appellee                                 Trial Court No.  CR0202101068

v.

Kenneth Marshall                          **DECISION AND JUDGMENT**

    Appellant                                Decided:  September 29, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**SULEK, J**.

{¶ 1} Appellant, Kenneth Marshall, appeals the August 16, 2022 judgment of the

Lucas County Court of Common Pleas which, following a jury trial, sentenced him to a

minimum of 130 years in prison on aggravated murder, felonious assault, and rape

convictions, with repeat violent offender specifications.  Marshall claims errors in the

trial court's failure to sever the offenses which were committed against three separate victims on different dates and places; the sufficiency and the manifest weight of the evidence; the trial court's failure to merge the aggravated murder and felonious assault offenses and two of the rape offenses; and the length of his sentence.

{¶ 2} Because the trial court committed plain error in failing to find that felonious assault and aggravated murder are allied offenses of similar import, the matter is remanded for resentencing with the instruction that the felonious assault and aggravated murder convictions be merged and the state be permitted to elect which allied offense it will pursue against Marshall. The trial court's judgment is affirmed in all other aspects.

## I. Facts and Procedural History

{¶ 3} On April 15, 2000, Toledo police responded to a possible homicide involving 19-year-old, C.L. It was later determined that C.L. was raped and strangled. On August 21, 2000, Toledo police received a sexual assault call where victim A.A., then 17 years old, stated that the suspect threatened her with a box-cutter or knife and vaginally raped her. Less than two months later, on October 2, 2000, S.S.-M., then 13 years old, reported to Toledo Police that an unknown individual forced her into a residential backyard performed oral sex on her and vaginally raped her.

{¶ 4} Unknown DNA profiles were identified from the swabs collected from each victim. In early 2021, Marshall's DNA was confirmed as present in all three cases. Following the DNA match, the Grand Jury returned an indictment charging Marshall

2.

with aggravated murder, murder, rape, and felonious assault, with sexual motivation and repeat violent offender ("RVO") specifications (Counts 1-4, relating to C.L.); two counts of rape with RVO specifications (Counts 5-6, relating to A.A.); and three counts of rape with RVO specifications (Counts 7-9, relating to S.S.-M.).

{¶ 5} On November 5, 2021, Marshall filed a motion for relief from prejudicial joinder, arguing that separate trials were warranted on the counts as to each individual because of the substantial danger that Marshall would be found guilty based on the jury's belief that he had a propensity to commit the alleged acts. The state countered that trying the counts jointly was proper as the evidence was simple and direct as to each incident and that the evidence would be admissible as proof of identity if the counts were tried separately. The state further argued that policy considerations, including judicial economy and inconvenience to witnesses, supported a joint trial. Agreeing with the state, on February 1, 2022, the trial court denied the motion.

{¶ 6} The following evidence involving the murder and rape of C.L., and the rapes of A.A. and S.S.-M., was presented during a four-day jury trial.

### A. C.L.

{¶ 7} E.L. testified that she and C.L. had been friends since high school. E.L. explained that C.L. and her boyfriend, Zeke, were involved in a "toxic" relationship, i.e. fighting and arguments, that C.L. was trying to terminate. The pair briefly lived together; C.L. moved out but Zeke still "stalked" her. E.L. admitted that C.L. was still getting

3.

money and gifts from Zeke that she would procure by occasionally having sex with him. E.L. stated that C.L. had performed as an exotic dancer and, on occasion, "contracted" with clients for sex. According to E.L., for her safety C.L. would always let her know when, where, and who she was with. According to E.L., C.L. had no planned arrangements around the time of her death. E.L. noted C.L.'s strong opposition to having sex with two different men on the same day.

{¶ 8} On August 14, 2000, around 12:00 p.m., E.L. testified that she and C.L. met at C.L.'s apartment on Robinwood Avenue in central Toledo. They immediately left in C.L.'s new Jeep to drive around and "show it off." While out, they stopped in north Toledo at C.L.'s mother's house and said hello to her neighbor, A.P.

{¶ 9} The pair returned to C.L.'s apartment to get ready to go out for the evening. They left the house at approximately 6:30-7:00 p.m. and continued to drive around making stops at various "hang out" points. Around 11:30 p.m.-12:00 a.m., they returned to A.P.'s house as he was having a party. E.L., C.L., and A.P. were in a bedroom when C.L. and A.P. began kissing; E.L. left the room. After C.L. reappeared, they left the house and went to three after-hours clubs. Around 4:30-4:45 a.m. they returned to C.L.'s apartment and E.L. went home. The two were meeting later that day to move C.L. into E.L.'s apartment.

{¶ 10} A.P. testified that he and C.L. had sexual relations while in his room in the early morning of April 15, 2000. Though intimate on a few prior occasions, they were

4.

mainly just friends. A.P. testified that C.L. had been dating a man from Detroit; he did not recall any other boyfriends.

{¶ 11} C.L.'s landlord on Robinwood, Theodora Wilson, testified by video deposition. Her statements regarding the day of the murder were harmonious with and testified to by Toledo Police Detective Timothy Campbell. She stated that on the date of C.L.'s murder she lived in a home on Robinwood that had an apartment in the back with a separate side entry. Wilson stated that C.L. rented the apartment and had been there less than one month when Wilson asked her to move out due to concerns over loud noises and voices.

{¶ 12} Wilson recalled that C.L.'s boyfriend helped her move in to the apartment. She described him as a large black man with a shaved head and a mustache. Wilson testified that on April 15, 2000, at approximately 4:30-5:00 a.m., she was awakened to the sound of loud music from a black car with silver trim parked across the street. The driver exited the vehicle, walked up the driveway, and rang the doorbell to C.L.'s apartment. From her kitchen window, Wilson told him to leave because she was not home. She stated that man resembled Zeke, the man who helped C.L. move into the apartment.

{¶ 13} Wilson stated that after C.L. returned home around 5:00-5:15 a.m., the man again exited his vehicle, talked with C.L., and then the pair entered her apartment. Shortly thereafter, Wilson contacted police on a noise complaint, stating that it sounded

5.

like furniture was being moved in C.L.'s apartment. When police arrived, Wilson sent them away stating the issue had resolved. Wilsons's 911 call was played for the jury during the testimony of responding Toledo Police Officer Robert Britt.

{¶ 14} That afternoon and after repeatedly calling to her, Wilson entered C.L.'s apartment. She discovered C.L. deceased and lying naked on the living room floor. She ran down to her home and called 911. Wilson acknowledged similarities between the photograph of Zeke and the sketch and computer-generated images of Marshall.

{¶ 15} Toledo Police officer, Michael Mugler, testified that at 3:00 p.m. on April 15, 2000, he and his partner were dispatched Code 3 (red lights and sirens) and Code 18 (a deceased person) to the Robinwood address to assist the fire crews on scene. They secured the scene logging who came and went and for what purpose. C.L.'s vehicle was towed for evidentiary purposes.

{¶ 16} Mugler stated that he encountered Zeke walking down the driveway. Zeke identified himself as C.L.'s boyfriend and that he wanted to know what was happening. He was eventually transported to the police station for questioning. Zeke was cleared of any wrongdoing after initially being charged with C.L.'s murder.

{¶ 17} Detective Terry Cousino, the on-call Toledo Police investigator, photographed and videotaped the crime scene. During his testimony, the photographs and video were published for the jury and were admitted into evidence. Cousino stated that he recovered no useable fingerprints. The physical evidence collected included

6.

C.L.'s underwear which was found around her right ankle, a black bra that was around her torso, and a flowered dress that was covering her head. Cousino attended the autopsy the following day. Cousino testified that he had no further involvement in the case until reviewing it as part of the cold case unit.

{¶ 18} Lucas County Deputy Coroner Cynthia Beisser performed an autopsy on C.L. Dr. Beisser testified regarding the external and internal trauma to C.L.'s neck. Photographs documenting the injuries were admitted into evidence. Dr. Beisser swabbed multiple areas of C.L.'s body to submit for DNA testing. She testified that the toxicology report showed a very low level of alcohol and no illegal drugs in C.L.'s system. Dr. Beisser ruled that C.L.'s cause of death was strangulation and the manner of death was homicide. Her report was admitted into evidence.

## B. A.A.

{¶ 19} Toledo Police Lieutenant Phillip Cook testified that on August 21, 2000, Toledo Police responded to a rape call at Dorr Street and Byrne Road in Toledo, Lucas County, Ohio. The victim, 17-year-old A.A., stated that when she was walking home from work an unknown individual pressed a box cutter to her throat, led her to a field behind a business, and forced her to have vaginal intercourse. A.A. stated that the suspect wore a condom for part of the rape; the officers were able to collect the condom and wrapper from the field as evidence.

7.

**{¶ 20}** A.A. described the victim as a black man, bald with a mustache, heavy set at approximately 250 pounds, and average height of 5'9" or 5'10". Following the rape, A.A. ran to a nearby home and the resident called her grandmother who then took her to the hospital where a rape kit was completed. An unknown DNA profile was developed from the swabs in the rape kit. A.A.'s trial testimony mirrored her statements to police.

### C. S.S.-M.

**{¶ 21}** On October 3, 2000, Toledo Police were dispatched to a residential backyard on Bryant Court in Toledo, Lucas County, Ohio, following the reported a rape of 13-year-old S.S.-M. S.S.-M. stated that she was walking back home from her grandmother's house when a man grabbed her, threatened to kill her, and took her behind a house where he performed sexual acts on her including oral sex, digital, and vaginal penetration. A rape kit was performed on S.S.-M. and sent for DNA testing. A DNA profile of an unknown suspect was recovered.

**{¶ 22}** S.S.-M. described her assailant as brown-skinned, big mustache, bald, a big belly, dark spots, and average height. A composite sketch of the suspect was created from a facial identification catalog. It was admitted into evidence. S.S.-M.'s trial testimony was consistent with her statements to police.

### D. The Investigation

**{¶ 23}** Lucas County cold case investigator Jay Gast, familiar with the case from his tenure with the Toledo Police Department, testified that in 2005, the DNA profiles in

8.

all three cases were linked to a single, unknown suspect. In 2018, after researching tools for developing suspects in cold cases, he contacted the Ohio Bureau of Criminal Investigation ("BCI") about allocating funds to contract with a private lab to conduct genetic testing on the unknown suspect's DNA. The tests included genetic genealogy research which essentially builds a family tree, or kinship, from the subject's DNA and DNA phenotyping which uses DNA in conjunction with all available physical descriptors to develop a composite image, including an age progression image. The images were admitted into evidence.

{¶ 24} As to the kinship DNA research, Gast stated that to increase accuracy the company requested additional DNA samples from specific individuals. Gast testified that they obtained samples from two individuals in the Zanesville, Ohio area but that despite the development of additional leads, the subject DNA was not definitively identified. The company also identified a male, Robert Marshall, in the Chicago area.

{¶ 25} In January 2021, Gast received a call from the BCI stating that a preliminary DNA match in the cases was uploaded to the national DNA database from Indiana. Marshall was identified as the match. Gast confirmed that Marshall was in the Toledo area in 2000 and had been issued an Ohio driver's license ten days prior to C.L.'s murder. Marshall's license photo was admitted into evidence.

{¶ 26} Gast testified that on January 15, 2021, he went to Indiana, secured a search warrant, and procured buccal (or inner cheek) swabs from Marshall. The samples

9.

were returned to Toledo and placed into police property. While speaking with Marshall, Gast learned that Marshall had lived in Chicago and had relatives in Chicago; Robert Marshall, his deceased father, and his brother, also Robert Marshall.

{¶ 27} Erika Jimenez, a forensic scientist at the BCI, conducted a comparative analysis of the DNA standard from Marshall and the samples from C.L., A.A., and S.S.-M. and issued multiple reports documenting the findings. The January 20, 2021 report contained the analysis of the DNA standard from Marshall and another individual and swabs collected from the rape kit of S.S.-M. Marshall's DNA was found in the panel of S.S.-M.'s underwear. On April 19, 2021, a supplemental report was issued finding that the vaginal swabs from S.S.-M. contained Marshall's DNA.

{¶ 28} A second January 20, 2021 report analyzed three swabs collected in A.A.'s rape kit and DNA standards from Marshall another individual. Marshall's DNA was found on swabs collected from A.A.'s thigh. A follow-up report issued on April 21, 2021, included an analysis of swabs taken from the condom recovered as evidence. Marshall's DNA was found on trace debris from the condom ring.

{¶ 29} The January 27, 2021 report analyzed various swabs taken from C.L. and DNA standards from multiple subjects including Marshall. The vaginal, rectal, abdominal, and thigh swabs all contained Marshall's DNA. A subsequent report found no traceable DNA on C.L.'s dress.

10.

## E. Jury Verdict and Sentencing

{¶ 30} At the close of evidence, the jury convicted Marshall on all counts and sexual motivation specifications. An RVO specification hearing was held and the court found that the state met it burden. As to C.L., on Marshall's aggravated murder conviction, with a sexual motivation specification, the trial court sentenced him to life in prison with parole eligibility after 20 years and an additional ten years for the RVO specification. The murder conviction merged. For rape, Marshall received a ten-year mandatory sentence with an additional ten years for the RVO. Marshall was sentenced to eight years in prison for felonious assault, with an additional ten-year term for the RVO specification.

{¶ 31} As to Count 5, the rape relating to A.A., Marshall was ordered to serve a mandatory ten years of imprisonment and an additional ten years for the RVO specification. A nolle prosequi was entered as to Count 6, rape.

{¶ 32} Finally as to Counts 7-9, involving S.S.-M., Marshall was sentenced to a mandatory sentence of ten years imprisonment on all three rape convictions with an additional ten-year imprisonment term on each for the RVO specification.

{¶ 33} Marshall's sentences on Counts 1, 3, 5, 7, 8, and 9 were ordered to be served consecutively to each other and concurrent with Count 4 for a minimum sentence of 130 years. This appeal followed.

11.

## II. Assignments of Error

{¶ 34} Marshall timely appealed his conviction and now raises five assignments of error:

I. The trial court abused its discretion in denying Appellant's Motion for Relief from Prejudicial Joinder, pursuant to Crim.R. 14.

II. The trial court abused its discretion by denying Appellant's motion for acquittal as to the charges related to victim C.L. pursuant to Crim.R. 29, because Appellant's convictions were not supported by sufficient evidence.

III. Appellant's convictions for the charges associated with victim C.L. were not supported by the manifest weight of the evidence.

IV. The trial court abused its discretion by failing to merge all appropriate sentences on the basis of allied offenses of similar import.

V. The trial court abused its use of consecutive sentences by imposing a 130-year (minimum) sentence which is disproportionate to the harm cased in this matter.

## III. Law and Analysis

### A. Joinder

{¶ 35} Marshall's first assignment of error challenges the trial court's denial of his motion to sever the trials on the charges relating to C.L., A.A., and S.S.-M.  Marshall

argues that the joint trial on all counts resulted in the jury unfairly convicting him based on its belief that he had a propensity to commit the crimes. Marshall specifically argues that joinder of the rape charges in relation to A.A. and S.S.-M. with the aggravated-murder and rape charges of C.L. created the possibility of substantial prejudice by linking the similarity of the rape offenses with C.L.'s rape and murder. The state argues that the evidence as to all three victims was simple and direct and easily separated. The state further argues that the identity of the assailant was a "material issue in dispute" and involved evidence that would be admissible in each case, even if tried separately.

{¶ 36} In general, "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charges * * * are of the same or similar character." Crim.R. 8; *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 43. Permitting joinder "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 37} Crim.R. 14 permits a defendant to request severance of the counts in an indictment "'on the grounds that he or she is prejudiced by the joinder of multiple offenses.'" *Clinton* at ¶ 44, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49. Specifically, the rule states:

13.

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires.

{¶ 38} "A claim of prejudice depends on whether the advantages of joinder and avoidance of multiple trials are outweighed by the right of a defendant to be tried fairly on each charge." *State v. Reynolds*, 6th Dist. Lucas No. L-16-1080, 2018-Ohio-40, ¶ 31.

{¶ 39} The defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres*, 66 Ohio St.2d 340, 340, 421 N.E.2d 1288 (1981). "But even if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as "other acts" under Evid. R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.'" *Clinton* at ¶ 44, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). When the state shows that the evidence of each crime is simple and direct, it is not required to meet the stricter "other acts" admissibility test. *State v. Robinson*, 6th Dist. Lucas No. L-09-1001, 2010-Ohio-4713, ¶ 24, citing *Lott* at 163-164, *State v. Hicks*, 6th Dist. Lucas Nos. L-04-1021, L-04-1022, 2005-Ohio-6848, ¶ 30, 41.

14.

{**¶ 40**} "Evidence is 'simple and direct' if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would 'improperly consider the testimony on one offense as corroborative of the other.'" *State v. Bradshaw*, 3d Dist. Logan No. 8-22-09, 2023-Ohio-1244, ¶ 13, quoting *State v. Valentine*, 5th Dist. Fairfield No. 18 CA 27, 2019-Ohio-2243, ¶ 48, quoting *State v. Wright*, 4th Dist. Jackson No. 16CA3, 2017-Ohio-8702, ¶ 52.  Evidence offered to prove a joined offense may be complex so long as it is not confused with evidence offered to prove the other joined offenses.  *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E. 3d 616, ¶ 110 ("Although the evidence presented to prove the murders was a bit more complex than the evidence presented to prove the assault, it was not confusing").

{**¶ 41**} Generally, an appellate court reviews a trial court's denial of a Crim.R. 14 motion to sever for an abuse of discretion.  *Clinton* at ¶ 46.  When, however, a motion to sever is made at the outset of a trial, it must be renewed at the close of the state's case or at the conclusion of all of the evidence so that a Crim.R.14 analysis may be conducted in light of all the evidence presented at trial.  *State v. Rojas*, 6th Dist. Lucas No. L-11-1276, 2013-Ohio-1835, ¶ 34; *Reynolds*, 6th Dist. Lucas No. L-16-1080, 2018-Ohio-40, at ¶ 27.  Failure to renew the motion forfeits all but plain error on appeal.  *Id.*  The renewed motion allows the trial court to examine any prejudice resulting from the joinder in light

15.

of the evidence introduced at trial. *State v. Hoffman*, 9th Dist. Summit No. 26084, 2013-Ohio-1021, ¶ 8.

{¶ 42} The record of this case contains no indication that Marshall renewed his motion to sever at any point during trial; thus, review is limited to plain error. Plain error affects substantial rights. Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Plain error is not present unless the outcome of the trial would have been different but for the complained of error." *Reynolds*, at ¶ 29.

{¶ 43} In *Clinton, supra,* the court rejected the argument that joinder of rape charges of one victim with rape and murder charges involving three additional victims would confuse the jury and was highly prejudicial. The court explained that the jury is capable of segregating the proof of multiple charges when the evidence of each crime is uncomplicated. *Id.* at ¶ 52, citing *Hamblin*, 37 Ohio St.3d at 159, 524 N.E.2d 476 (1988).

{¶ 44} Here, the evidence the state offered to prove Marshall's rape and murder of C.L. and the rapes of A.A. and S.S.-M. was simple and direct. The crimes occurred on different dates, times, and places and involved three separate victims. C.L.'s friend and her landlord narrated the events surrounding her rape and murder. A.A. and S.S.-M. each testified regarding the events specific to their cases. Police testimony regarding the investigation of the three separate incidents was clear and concise. There is nothing to

16.

indicate that the jury was incapable of separating the evidence as to each victim. Further, the jury was specifically instructed:

> The charges set forth in each count in the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately and you must state your findings as to each count uninfluenced by your verdict as to any other count.

The jury is presumed to follow the court's instructions. *Clinton* at ¶ 52.

{¶ 45} The trial court did not err in denying Marshall's motion to sever because the evidence presented for each offense was simple and direct. Marshall's first assignment of error is not well-taken.

**B. Sufficiency and Manifest Weight of the Evidence**

{¶ 46} In his second and third assignments of error, Marshall argues that his convictions relating to C.L. (Counts 1-4) are based on insufficient evidence and are against the manifest weight of the evidence.

{¶ 47} "Insufficiency and manifest weight are distinct legal theories." *State v. Fenderson*, 6th Dist. Erie No. E-21-018, 2022-Ohio-1973, ¶ 73. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61

17.

Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In contrast, when reviewing a manifest weight claim,

> "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.*, quoting *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 48} Marshall was convicted of the aggravated murder, murder, rape, and felonious assault of C.L., with RVO specifications. In 2000, aggravated murder, in violation of R.C. 2903.01(B) and (F), provided: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, * * * rape, * * *." Murder with a sexual motivation is established by proof that a person caused the death of another as a proximate result of the offender's committing or attempt to commit a violent first or second-degree felony. R.C. 2903.02(B) and (D). Rape, R.C. 2907.02(A)(2) and (B), prohibits an individual from threatening or physically forcing an individual to engage in sexual conduct. Finally,

18.

felonious assault, R.C. 2903.11(A)(1) and (D), prohibits knowingly causing serious physical harm to another.

{¶ 49} Marshall argues that the evidence supporting the charges as to C.L. were insufficient to submit to a jury because although Marshall's DNA was found on C.L. both externally and internally, there was no evidence of trauma which is indicative of force. Marshall emphasizes C.L.'s work as an exotic dancer, her various male visitors, and the testimony of C.L.'s landlord's that her boyfriend, Zeke, who had helped her move in three weeks prior, was the same man who came to C.L.'s door in the early morning of April 15, 2000. Marshall incorporates the same arguments in support of his claim that his convictions were against the manifest weight of the evidence.

{¶ 50} Contrary to Marshall's assertions, there is sufficient evidence demonstrating that he raped and killed C.L. The DNA evidence clearly demonstrates that Marshall had sexual contact with C.L. The analysis of the vaginal and rectal swabs taken from C.L. showed no other male contributors. Next, how C.L. was found— with her dress around her neck, bra around her waist, and underwear around her ankle— evidences a forced act. Further, the noise from the apartment around the time of the murder was loud enough for the landlord to call the police. As to identity, while the landlord testified that the suspect looked like Zeke after reviewing photos and sketches, she admitted that Marshall and Zeke looked similar.

19.

{¶ 51} Viewing all the evidence presented at trial in a light most favorable to the state, a rational juror could have found the elements of each charge in Counts 1-4 proven beyond a reasonable doubt. Additionally, the evidence presented does not establish that the jury lost its way resulting in a manifest miscarriage of justice. Marshall's second and third assignments of error are not well-taken.

### C. Marshall's Sentence is not Contrary to Law

### 1. Allied Offenses

{¶ 52} In Marshall's fourth assignment of error he argues that because the charges as to C.L. constitute one continuous act, with a single animus, the offenses of rape and felonious assault were allied and should have merged with his aggravated murder conviction at sentencing. Marshall similarly argues that the rape offenses relating to S.S.M. were one continuous act and that the convictions should have merged.

{¶ 53} R.C. 2941.25 codifies the constitutional protections of the Double Jeopardy Clause prohibiting multiple punishments for the same offense. *State v. Rogers*, 6th Dist. Erie Nos. E-21-027, E-21-031, 2022-Ohio-4126, ¶ 16. The section provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

20.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 54} The test for determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, involves three questions:

"(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered."

*State v. Bailey*, Slip Opinion No. 2022-Ohio-4407, ¶ 10, quoting *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.

{¶ 55} "The defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal

21.

act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987); *State v. Smith*, 6th Dist. Lucas No. L-22-1141, 2023-Ohio-866, ¶ 10. "An appellate court reviews de novo whether offenses should be merged as allied offenses under R.C. 2941.25. *Smith* at ¶ 10, citing *Bailey* at ¶ 6. Further, the imposition of concurrent sentences is not equivalent to merging allied offenses. *State v. Damron*, 129 Ohio St.3d 86, 2011-Ohio-2268, 950 N.E.2d 512, ¶ 17.

{¶ 56} Because Marshall did not raise the issue of merger or otherwise object to the trial court's imposition of the sentences, he has forfeited all but plain error. *State v. Hair*, 6th Dist. Lucas Nos. L-22-1164, L-22-1165, 2023-Ohio-2422, ¶ 66, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3. Plain error affects a substantial right. *Id.*

{¶ 57} This court has previously noted that whether offenses are subject to merger under R.C. 2941.25 "'necessarily turns on an analysis of the facts, which can lead to exceedingly fine distinctions.'" *State v. Fisher*, 6th Dist. Lucas No. L-22-1150, 2023-Ohio-2088, ¶ 19, quoting *Bailey* at ¶ 11. Thus, a reviewing court "must consider the defendant's conduct and how the offenses were committed." *State v. Daniel*, 6th Dist. Lucas No. L-22-1231, 2023-Ohio-2800, ¶ 64, citing *Ruff* at ¶ 25. Separate sentences are proper if offenses are committed separately, committed with a separate animus, or are dissimilar in import. R.C. 2941.25; *Ruff* at paragraph three of the syllabus.

22.

{¶ 58} Here, as to C.L., Marshall argues that the rape, felonious assault, aggravated murder, and murder were one continuous bad act with the sole animus being C.L.'s death. As to the rape and aggravated murder counts, the evidence demonstrates that they were committed with a separate animus. C.L. was found with her clothing partially removed and Marshall's semen was found in her vagina and anus. There was no evidence of any genital trauma resulting from the rape or that the rape in any way contributed to C.L.'s death. C.L. died from manual strangulation lasting several minutes. Thus, the acts were committed separately and with different instrumentalities. Upon review, in this case the offenses of rape and aggravated murder do not merge.

{¶ 59} Marshall similarly argues that his felonious assault and aggravated murder convictions stem from a single act and should have been merged at sentencing. The state argues that the coroner's testimony as to the contusions to C.L.'s face and neck suggests that she suffered two independent harms.

{¶ 60} Reviewing Marshall's conduct, C.L.'s strangulation was the same act which caused her death—thus, there was no separate identifiable harm. Further, the state indicated in its closing:

So what did Kenneth Marshall do? Felonious assault. So felonious assault is causing, knowingly causing serious physical harm to another person. The judge is going to define serious physical harm for you, but strangling someone to the point of unconsciousness is serious physical

23.

harm. It's going to meet the definition to a T. Causing someone to lose consciousness like that is serious physical harm. So if you think that her death happened as a result of that strangulation, then you have found the second count of murder as well as the felonious assault attached to it.

{¶ 61} Reviewing the arguments of the parties, it is clear that the entirely of C.L.'s strangulation formed the basis of the felonious assault and murder charges. The murder conviction was merged with Marshall's aggravated murder conviction at sentencing. Thus, the offenses the felonious assault and aggravated murder were also allied and subject to merger at sentencing. Accordingly, the trial court committed plain error in failing to merge the offenses.

{¶ 62} As to S.S.-M., Marshall contends that his rape convictions for vaginal rape, digital penetration, and oral sex were one continuous act, with a single animus and constitute allied offenses of similar import. Ohio law is clear that "multiple separate and distinct acts of penetration will support multiple convictions and sentences, and oral, anal, and vaginal rapes constitute separate and distinct acts." *State v. Hall*, 6th Dist. Lucas No. L-17-1069, 2018-Ohio-619, ¶ 10, citing *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 48; *State v. Pippin*, 1st Dist. Hamilton Nos. C-160380, C-160381, 2017-Ohio-6970, ¶ 49.

{¶ 63} At trial, S.S.-M. testified that Marshall performed oral sex on her, he digitally penetrated her vagina, and he inserted his penis in her vagina. Because these

24.

were separate acts, Marshall has failed to demonstrate entitlement to the protections against multiple punishments for the offenses relating to S.S.-M.

{¶ 64} Accordingly, Marshall's fourth assignment of error is well-taken, in part.

## 2. Proportionality

{¶ 65} Marshall's final assignment of error asserts that the court erred in sentencing him to six consecutive sentences for an aggregate minimum of 130 years of imprisonment. Because Marshall's claim regarding allied offenses is meritorious, in part, his proportionality argument is moot and will not be addressed. Marshall's fifth assignment of error is not well-taken.

## IV. Conclusion

{¶ 66} For the foregoing reasons, the judgment if the Lucas County Court of Common Pleas is affirmed, in part, and reversed, in part. The matter is remanded to the trial court for a new sentencing hearing to merge the felonious assault and aggravated murder convictions and permit the state to elect which allied offense Marshall is to be sentenced on. The parties are to evenly share the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part,
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Gene A. Zmuda, J.

Myron C. Duhart, P.J.

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.