**[Cite as *State v. Hurt*, 2024-Ohio-3115.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230370 |
| | | TRIAL NO. B-2001994-B |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| DYLAN HURT, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 16, 2024

*Melissa A. Powers,* Hamilton County Prosecuting Attorney*,* and *Judith Anton Lapp,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Angela J. Glaser*, for Defendant-Appellant.

**BOCK, Presiding Judge.**

{¶1}    Defendant-appellant Dylan Hurt appeals his convictions for aggravated murder and attempted murder stemming from two drive-by shootings in April 2020.

{¶2}    Hurt first argues that the trial court erred in quashing his subpoena of his codefendant Leaunte Baltimore without holding a hearing. Because Baltimore's attorneys appeared before the court and stated that Baltimore intended to invoke his privilege against self-incrimination, and Hurt's attorneys did not proffer any non-incriminating line of questioning, we hold that the trial court did not err in quashing the subpoena without questioning the codefendant personally.

{¶3}    Next, Hurt asserts that the trial court violated his right to confront the witnesses against him when it removed him from the courtroom twice during his jury trial. We overrule Hurt's assignment of error because we cannot say that the trial court abused its discretion by finding that Hurt was voluntarily absent after Hurt initially refused to come to court and then refused to answer the trial court's direct questions regarding his desire to be present.

{¶4}    Hurt further contends that the trial court committed plain error in not severing the counts in the indictment related to the two separate shootings, and that he received ineffective assistance of counsel because his attorneys failed to argue a prior motion to sever. Because the evidence related to both shootings was simple and distinct, we hold that Hurt was unable to demonstrate prejudice by the joinder of the counts and we accordingly overrule both assignments of error.

{¶5}    Finally, Hurt argues that his convictions are based on insufficient evidence and against the manifest weight of the evidence. We overrule this assignment

of error due to the substantial circumstantial evidence establishing each element of the offenses of which Hurts was convicted.

{¶6}    Because we find no error, we affirm the trial court's judgment.

## I.    FACTS AND PROCEDURE

### A. Procedural history

{¶7}    The state indicted Hurt for aggravated murder, murder, attempted murder, felonious assault, and having weapons under disability ("WUD").[1] The charges stemmed from two shootings: one on Llewellyn Avenue and another that resulted in the death of David Norwood. Each count other than the WUD counts carried gun specifications. And in a separate case later consolidated with the shooting cases, Hurt was charged with failure to comply for attempting to flee during his arrest.

{¶8}    Hurt's first set of attorneys moved to sever the Llewellyn shooting counts from the Norwood shooting counts. Before the court ruled on the motion, Hurt's attorneys withdrew. At a hearing on another motion, Hurt's new attorneys stated they were adopting prior counsel's motion to sever. While the trial court stated it would hear arguments on the motion to sever later, it did not rule on that motion and Hurt's counsel did not pursue it.

{¶9}    After the state produced a purported confession authored by Hurt's codefendant Leaunte Baltimore, Hurt subpoenaed Baltimore to testify at trial. The trial court granted Baltimore's motion to quash Hurt's subpoena based on Baltimore's attorney's representation that Baltimore would invoke his Fifth Amendment right against self-incrimination and refuse to answer any questions asked by Hurt's counsel.

---

[1] The trial court merged the murder and felonious-assault counts into the aggravated and attempted-murder counts, and the merged counts are not at issue in this appeal.

3

{¶10} Shortly before trial, Hurt moved pro se to remove his counsel. Hurt's second set of counsel then moved to withdraw. Though Hurt repeatedly requested new counsel, the trial court did not appoint new counsel and went forward with trial. After an eight-day trial, the jury acquitted Hurt on the WUD and failure-to-comply counts and found him guilty on all other counts with the associated gun specifications.

{¶11} After merging several counts, the trial court sentenced Hurt to life in prison without parole for aggravated murder with a five-year term for the gun specification and a ten-to-15-year term in prison on the attempted-murder charges with a five-year gun specification. The trial court ordered the two attempted-murder sentences to run concurrently and the remainder to run consecutively, for an aggregate sentence of 20-25 years consecutive to life in prison without parole.

**B. Facts**

{¶12} Hurt's charges stemmed from two shootings in Cincinnati's South Cumminsville neighborhood in April 2020.

### 1. Llewellyn Avenue Shooting

{¶13} On April 7, 2020, shortly before 3:58 p.m., a truck driver witnessed a drive-by shooting at the intersection of Llewellyn Avenue and Elmore Street targeting A.O., J.G, and a third unidentified individual ("the Llewellyn shooting"). The truck driver described seeing a dark-colored Jeep Wrangler with the doors and roof removed drive to where A.O, J.G., and the third individual were standing. He recalled seeing three occupants in the Jeep. Two occupants stood up in the Jeep and shot at the three people standing on the corner. Two of the people on the corner took cover behind an SUV and the third was lying on the ground. The Jeep then sped away.

{¶14} The state showed the truck driver a photograph of a Jeep that Hurt had rented. The truck driver believed the Jeep depicted in the photograph resembled the Jeep from the shooting, except that the back panel of the Jeep had been removed because he could see through the back of the Jeep. He also testified that one of the occupants of the vehicle was wearing a red-hooded sweatshirt, shorts, and black and white open-toed sandals ("slides").

{¶15} After the Jeep left the scene, the truck driver observed one of the people on the corner move the person lying on the ground to a truck and drive away. The third person followed him in a separate car. Casings recovered from the scene suggested that a person standing on the corner had returned fire at the Jeep.

{¶16} On cross-examination, the truck driver stated that he had told detectives a week after the shooting that the person in the Jeep had been wearing an orange hoodie. The truck driver did not identify Hurt as one of the people in the Jeep.

{¶17} Sergeant Kevin Lynn went to the University of Cincinnati Medical Center ("U.C.M.C.") to see if any shooting victims had arrived at the hospital. He learned that A.O. had brought J.G. to U.C.M.C. When A.O. attempted to leave the hospital, Lynn stopped and detained him.

{¶18} When Detective Joseph Coombs asked about J.G.'s status, U.C.M.C. personnel told him that J.G. was in surgery for nonlife-threatening injuries. Coombs did not have any contact with J.G. at the hospital. Coombs later went to the police station where he interviewed A.O., who did not cooperate with investigators. The state later charged A.O. with having weapons under a disability. Coombs testified that at A.O.'s court dates from 2020 through 2022, he had contact with both A.O. and J.G.,

5

and that J.G. was unable to walk. Neither man cooperated with the investigation or testified at Hurt's trial.

### 2. David Norwood's murder

{¶19}  On April 15, 2020, around 4:21 p.m., David Norwood died in a drive-byshooting on Cass Avenue in South Cumminsville. A resident testified that he saw a black Jeep and a silver sedan driving down the road. When the silver sedan "pulled over like he was gonna let the truck by," the Jeep began to pass the sedan. But the Jeep stopped and "somebody stuck a gun out the window and started shooting at that little car. And another passenger came from the back window with another gun shooting out the back of the car." The Jeep then drove away. The Jeep had tinted windows, and the witness was unable to identify any of its occupants.

{¶20}  The resident testified that he was a "car guy" and that the Jeep caught his eye because it was "a really good-looking truck." The shooters' Jeep had all the doors attached. The state showed the resident two photographs of a Jeep that Hurt had rented. The resident testified that the shooters' Jeep looked different. On cross-examination, the witness stated that he had told detectives shortly after the shooting that the Jeep had a red stripe on it and that the Jeep's fender had silver bolts on it. He agreed that the state's photos looked different than the Jeep he remembered.

### 3. A funeral, a police chase, and a gun

{¶21}  Two days after Norwood's murder, officers monitored Sanchez Lee's funeral. Lee, Baltimore's brother, had been murdered. Officer Eric Schaible observed Hurt at the funeral and saw Hurt get into the driver's seat of a black Kia Altima. Officers attempted to initiate a traffic stop, but the vehicle fled. The police followed the car, but called off the pursuit after they lost sight of the car.

6

{¶22} The following day, Officer Kevin Broering heard over the radio that a gun had been found on the side of the road along the route where officers followed Hurt's car. Officer Broering recovered a Cobray M-11 pistol on the side of the road. DNA testing of the Cobray returned a DNA profile match from one individual. Other minor DNA profiles could not be identified.

### 4. The state presented circumstantial evidence

{¶23} The state produced circumstantial evidence that (1) before the shootings, Hurt had rented a Jeep matching the description of the shooters' Jeep; (2) video showed the Jeep in the area of both shootings near the time of the shootings and Hurt wearing clothing similar to the clothing worn by a person in the Jeep on the days of both shootings; (3) Hurt's and Baltimore's cell phones were together "in the area" of the shootings on both days; and (4) shell casings recovered from the Jeep matched shell casings recovered from both crime scenes and the Cobray found on the road.

#### a) K.F. rented a Jeep for Hurt

{¶24} After the Llewellyn shooting, officers searched license plate readers ("LPR") in the area to identify a vehicle matching the description of the shooters' vehicle. Officers located an LPR a mile from the Llewellyn shooting that recorded a dark-colored Jeep with the doors removed going north into the Villages at Roll Hill apartment complex ("Roll Hill") near the time of the shooting. The Jeep had a Kentucky license plate.

{¶25} Detective Dewayne McMenama determined that the Jeep was a rental from Avis Car Rental at the Northern Kentucky Airport ("CVG"). McMenama learned from Avis that K.F. had rented the Jeep. When McMenama interviewed K.F., she confirmed that she had rented the Jeep days before the Llewellyn shooting. K.F.

testified that she had rented the Jeep for Hurt and identified Hurt as the man with her in CVG's surveillance footage. K.F. gave Hurt the car keys and Hurt left with the Jeep.

{¶26} K.F. testified that the day before the Llewellyn shooting, she and Hurt returned to Avis because Hurt had lost the keys to the Jeep. K.F. again identified Hurt as the man with her in the CVG surveillance video. The video shows Hurt wearing a red and black sweatshirt, black pants, and black and white slides.

{¶27} A few days after the Llewellyn shooting, Hurt texted K.F. two photos: one showed the Jeep with damage to the rear passenger-side window and the other was the license plate, which matched the rented Jeep's license plate. When K.F. took the Jeep to be repaired, she noticed it had bullet holes. Hurt paid for the repairs.

b) Video evidence

i. *The Jeep was near Llewellyn Avenue before the shooting*

{¶28} Officers recovered video footage from cameras near both shootings. Cameras at Roll Hill, about a mile from Llewellyn Avenue, captured the Jeep, with its doors and windows removed, entering Roll Hill at 3:25 p.m. and parking in front of Baltimore's girlfriend's ("C.B.") apartment. A man in a white t-shirt exited from the car and entered the apartment. A man in a red sweatshirt moved from the passenger side of the Jeep into the driver's seat. A third person moved to the passenger side of the car. The man in the white t-shirt returned to the Jeep. When the Jeep left Roll Hill, the driver was wearing a red sweatshirt, black pants, black and white slides, and large, white-framed sunglasses. A video recovered from Baltimore's phone showed Hurt wearing similar sunglasses.

{¶29} The Jeep left and returned to the apartment before leaving Roll Hill again at 3:33 p.m., about 25 minutes before the Llewellyn shooting. LPR footage

showed the Jeep's rear passenger window was intact and the rear passenger side of the vehicle was not damaged. The Jeep was not captured on video again that day.

### ii. *Hurt's Jeep and Norwood's vehicle were captured on camera before Norwood's murder*

{¶30} Police found a video on Baltimore's phone with time and date stamps corresponding with footage from LPRs and various cameras belonging to neighborhood businesses, a church, and a Metro bus. Baltimore's video showed Baltimore in a black jacket with the hood up in what appears to be the interior of the Jeep. The Jeep's driver was a man wearing a green-hooded sweatshirt, a surgical mask covering his face, and a black knitted cap. McMenama testified that this man was "clearly Hurt." The sweatshirt had an orange logo on the right side of the chest. A video from Baltimore's phone recorded a few days before Norwood's murder showed Hurt wearing a similar sweatshirt and hat.

{¶31} The various neighborhood cameras showed a dark Jeep, with "damage that stood out" on the passenger side, driving in and near the South Cumminsville neighborhood. Footage showed the Jeep leaving C.B.'s apartment approximately 11 minutes before Norwood's 4:21 p.m.[2] murder. Two people left C.B.'s apartment and got into the Jeep. One wore a green-hooded sweatshirt with the hood up and a surgical mask. The other wore a dark jacket with the hood up.

{¶32} The cameras captured the Jeep driving on several streets, turning around, and driving at a high rate of speed. The damage to the Jeep's passenger side was visible in parts of the footage. At 4:19—two minutes before the murder—footage

---

[2] McMenama testified that Norwood was murdered at "[r]oughly 4:21. 911 was called at 4:27, I believe." At another point, McMenama testified that the murder took place at 4:27 p.m.

showed a dark Jeep about 12 seconds behind Norwood's car, which was driving toward Cass Avenue, the site of the murder.

**{¶33}** At 4:31 p.m., after Norwood's murder, cameras captured a dark Jeep passing a nearby apartment complex and then turning onto Beekman Street, near an entrance ramp to I-74 West.

c) <u>Hurt's and Baltimore's cell phones were in the area of both shootings</u>

**{¶34}** Lance Kepple, a retired FBI agent, testified as an expert cellular phone record analyst. He testified that cellular phone towers each create a unique cell. Radio signals from the tower go to a phone, which then sends a signal back to the tower. As a phone moves, it receives and provides signals to different towers. The integrated system "constantly" measures a phone's distance from a tower, permitting an analyst to determine that a phone was "at or near" a location. "At or near" can mean up to a mile from a location.

**{¶35}** Police identified Hurt's cellphone number and two phone numbers associated with Baltimore. Kepple compared these cell phone records with dates and times when Hurt was at CVG and of the two shootings. Kepple testified that Hurt's cellphone was at or near CVG at the time that he and K.F. rented the Jeep and when they returned to replace the lost keys.

**{¶36}** On the day of the Llewelyn shooting, Hurt's and Baltimore's phones were at or near Roll Hill. Between 3:49 p.m. and 3:57 p.m., Baltimore's phone switched towers, which most commonly is caused by the phone moving, from one west of Llewellyn Avenue to another tower about a half mile east of Llewellyn Avenue, suggesting that the phone had moved towards the scene of the shooting.

{¶37}   On April 15, 2020, the day of Norwood's murder, Hurt's and Baltimore's phones were at or near C.B.'s apartment in Roll Hill at 2:54 p.m., which was consistent with the surveillance video of the Jeep arriving at the apartment. Between 4:20 and 4:21 p.m., Hurt's phone moved from Roll Hill to "at or near" 3804 Cass Avenue, the location of the Norwood murder. Then Hurt's phone was "at or near" Elmore Street and Beckman where a camera showed a dark Jeep. Both phones moved to a cell tower west of Roll Hill. Later that afternoon, Hurt's and Baltimore's phones used cell towers consistent with the phones being together several miles west of the Norwood murder.

d)   Police found shell casings used in the shootings inside the Jeep

{¶38}   A week after Norwood's murder, Officer Taylor Howard spotted the Jeep that Hurt had been driving and initiated a traffic stop. The driver, R.S., was the sole occupant. Law enforcement processed the Jeep for evidence.

{¶39}   Officers found 9 mm and .40-caliber casings in the Jeep. Kelsey Cramer, a forensic scientist, testified that the 9 mm casings found in the Jeep matched casings found at the Llewelyn Shooting. A test fire from the Cobray that police found after Hurt fled matched 9 mm casings found at the Llewellyn shooting. And a .40-caliber casing found in the Jeep matched casings found at the Norwood murder scene.

{¶40}   Officers observed signs that the Jeep had been damaged and repaired including broken glass, a rear passenger-side window that was a different brand than the other windows, and bullet holes in the rear passenger panel, which had been patched and painted.

## II.   Law and Analysis

### A.  First assignment of error: Quashed subpoena

{¶41}   In his first assignment of error, Hurt argues that the trial court abused

11

its discretion when it quashed his subpoena of his codefendant Baltimore without first holding an evidentiary hearing. Before trial, the state produced a document purportedly authored by Baltimore in which he took sole responsibility for both shootings and stated that Hurt was not involved. Hurt's attorneys subpoenaed Baltimore to testify at Hurt's trial.

{¶42} Baltimore's attorneys moved to quash the subpoena and represented to the court that they had advised Baltimore not to testify and Baltimore "was quite clear that he was not interested in" testifying for the state or Hurt. Baltimore's attorneys reaffirmed this position later in the trial. At the time, Baltimore faced criminal charges related to the shootings. The trial court quashed the subpoena without hearing directly from Baltimore.

### 1. Sixth Amendment Compulsory Process

{¶43} We review a trial court's ruling on a motion to quash a subpoena for an abuse of discretion. *State v. Bussle,* 2017-Ohio-4045, ¶ 14 (11th Dist.).

{¶44} The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." *See Gannett Co. v. DePasquale*, 443 U.S. 368, 379 (1979). "Few rights are more fundamental than the right of an accused to present witnesses on his behalf." *State v. Brown*, 64 Ohio St.3d 649, 652 (1992). A defendant's right to present a complete defense, however, can run counter to a potential witness's privilege against self-incrimination found in the Fifth Amendment. *Hoffman v. United States*, 341 U.S. 479, 485-486 (1951).

**{¶45}** Before excusing a witness on Fifth Amendment grounds, trial courts must ensure that the witness's assertion of privilege is valid. *State v. Arnold*, 2016-Ohio-1595, ¶ 45. Where a witness invokes the Fifth Amendment privilege, trial courts must determine if, should the witness directly answer the question, that answer could provide evidence tending to establish an element of an offense or incriminate the witness. *Id.*

**{¶46}** Trial courts must "conduct a sufficient inquiry to determine that the witness will not offer any testimony" and instead intends to invoke the Fifth Amendment privilege as it relates to all proposed lines of questioning. *State v. Wade*, 2023-Ohio-3490, ¶ 58 (10th Dist.). The trial court must ensure the defendant seeks to elicit only incriminating testimony. *Id.* A trial court need not compel a person to testify on behalf of a criminal defendant when it determines that, rather than offering testimony, the person will merely invoke the Fifth Amendment privilege against self-incrimination. *State v. Kirk*, 72 Ohio St.3d 564, 569 (1995); *but see Rios-Vargas v. People*, 2023 CO 35 (reasoning that the Fifth Amendment right is an "option of refusal, not a prohibition of inquiry," and holding that a defendant may call a nonparty alternate suspect and question the witness in front of the jury); *State v. Herbert*, 234 W.Va. 576, 584 (2014) (same). Moreover, there is no Sixth Amendment right to call a witness to the stand for the *sole purpose* of having that witness invoke the Fifth Amendment in front of the jury. *Kirk* at 569.

**{¶47}** A trial court conducts a sufficient inquiry where a witness's attorney informs the court that the witness has been advised not to testify and the witness does not intend to testify. *See State v. T.S.*, 2021-Ohio-2203, ¶ 31 (10th Dist.); *see also State v. Spangler,* 2017-Ohio-268, ¶ 36 (5th Dist.) ("While [the witness] herself was not

13

directly subject to the trial court's inquiry, [the witness's] interests were represented by her appointed counsel."); *Bussle*, 2017-Ohio-4045, at ¶ 15 (11th Dist.).

### 2. Granting the motion to quash was within the trial court's discretion

**{¶48}** The trial court did not abuse its discretion in quashing the subpoena issued to Baltimore because his attorneys represented that he would invoke his Fifth Amendment privilege. Hurt intended to question Baltimore about the substance of the alleged confession. He did not suggest that he would question Baltimore about any nonincriminating topic. Because an answer to questions about the alleged confession would have a "reasonable tendency" to incriminate Baltimore, his assertion of the Fifth Amendment privilege was valid. *See Arnold*, 2016-Ohio-1595, at ¶ 45. Given Baltimore's counsel's representations and the only topic about which Hurt intended to illicit testimony—the alleged confession—the trial court conducted a sufficient inquiry.

**{¶49}** Hurt asserts that the trial court was required to conduct a hearing before quashing the motion. He is correct that this court has stated, "When deciding a motion to quash a subpoena under Crim.R. 17, the trial court must conduct an evidentiary hearing." *State v. Findler*, 2021-Ohio-449, ¶ 6 (1st Dist.). But *Findler* involved a motion to quash a subpoena for documents issued under Crim.R. 17(C). It did not involve the competing constitutional interest presented when the object of the subpoena asserts the Fifth Amendment privilege. While Hurt cites other cases in which trial courts did hold a hearing or voir dire witnesses before ruling on a motion to quash, those cases did not involve an assertion of privilege by a witness. *See State v. Brown*, 64 Ohio St.3d 649, 652 (1992) (trial court erred in quashing subpoena of informant without investigating whether informant's testimony would help defense);

14

*State v. Tuttle*, 2003-Ohio-4260, ¶ 43 (5th Dist.) (trial court quashed subpoena of witnesses after determining that their proffered testimony was not relevant).

{¶50} While generally a trial court should hold a hearing to determine whether a witness is validly invoking the Fifth Amendment privilege against self-incrimination, under the circumstances of this case—Baltimore's attorneys represented to the court that they had advised Baltimore not to testify, he had no intention of testifying, and Hurt's counsel proposed no line of question that would not incriminate Baltimore—the trial court could clearly ascertain that Baltimore's assertion of his privilege was valid and a hearing was not required.

{¶51} We overrule Hurt's first assignment of error.

## B. Second assignment of error: Hurt's removal from his trial

{¶52} Hurt's second assignment of error asserts that the trial court violated his constitutional right to be present at his trial when it removed him from the courtroom. During Hurt's trial, the trial court removed him from the courtroom on multiple days. Because Hurt's arguments are limited to his removal on the third and fourth days of trial, we limit our analysis to those days.

### 1. Criminal defendants have the right to attend their trials

{¶53} A trial court's decision to remove a defendant from the courtroom is reviewed for an abuse of discretion. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970).

{¶54} A defendant has the right to be present in the courtroom at every stage of the trial "absent waiver of his rights or other extraordinary circumstances." *State v. Williams*, 6 Ohio St.3d 281, 286 (1983). A defendant's right to be present at every critical stage of a trial is guaranteed by the United States Constitution's Sixth Amendment's Confrontation Clause and the Fifth Amendment's Due Process Clause.

15

*United States v. Gagnon*, 470 U.S. 522, 526 (1985); *Allen* at 338. The Ohio Constitution similarly guarantees a criminal defendant the right to be present at every stage of a criminal trial. Ohio Constitution, Art. I, § 10; *State v. Williams*, 6 Ohio St.3d 281, 286 (1983).

{¶55} Moreover, Crim.R. 43 provides that a defendant "must be present at every stage of the criminal proceeding and trial" unless the defendant's absence is voluntary or the defendant's conduct "is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence." The Ohio Supreme Court has described Crim.R. 43 as a codification of a criminal defendant's constitutional right to be present at trial. *Williams* at 286 ("In Ohio, the expanded scope of the Due Process Clause, at least in criminal proceedings, had been embodied in Crim. R. 43(A).").

{¶56} Like most rights, however, a defendant's right to be present at trial can be waived. Waiver of a constitutional right involves "the intentional relinquishment or abandonment of a known right or privilege." *State v. Stone*, 43 Ohio St.2d 163, 166 (1975). This court has stated that the constitutional right to be present at trial, as codified in Crim.R. 43, "is so fundamental that . . . it cannot be removed except by a voluntary, intelligent and express waiver." *State v. Homesales, Inc.*, 2010-Ohio-5572, ¶ 9 (1st Dist.), quoting *State v. Sutherlin*, 111 Ohio App.3d 287, 293 (1st Dist. 1996).

{¶57} Crim.R. 43(A) provides that when a defendant is voluntarily absent after initially being present during trial, the trial court may continue the trial. But because "[v]oluntariness is an issue of fact . . . the trial court must determine that the defendant is voluntarily absent before it can proceed with the trial." *State v. Carr*, 104 Ohio App.3d 699, 703 (2d Dist. 1995). We review factual findings for clear error and will

not disturb those findings when they are supported by competent, credible evidence. *State v. Jackson*, 2015-Ohio-2473, ¶ 55 (9th Dist.).

**{¶58}** Defendants are voluntarily absent where they refuse to leave their jail cells. *State v. Grate*, 2020-Ohio-5584, ¶ 85. The Eleventh Circuit has held that, after a defendant initially refuses to come to court from jail, the defendant's subsequent repeated refusal to answer whether the defendant wants to be present can constitute a waiver of the right to be present. *United States v. Sterling*, 738 F.3d 228, 237 (11th Cir. 2013).

### 2. The trial court did not abuse its discretion in continuing trial without Hurt

**{¶59}** Based on the specific circumstances in this case, we hold that the trial court did not abuse its discretion by conducting trial without Hurt present.

### a) Day four

**{¶60}** Hurt was present for the first three days of his trial. But on the morning of the fourth day of trial, deputies informed the trial court that Hurt had told them he did not want to go to court. Hurt told them that he "felt like his defense team wasn't working for him." The trial court ordered the deputies to bring Hurt to the courtroom. When he arrived in the courtroom, the following exchange occurred:

COURT: And, Mr. Hurt, I will give you the option to stay and take part in your defense. At this time, would you like to do that?

HURT: I keep telling you all the same thing. I keep telling you the same thing. I have a right to a fair trial. I mean, go to trial. Ain't fair.

. . .

COURT: Okay. Would you like to stay here and participate or not? It's a yes or no question, because we've got to move on here.

HURT: Proceed. But, like, I don't know what is going on. Like, I'm not comfortable with sitting here and they not doing what I asking them to do, asking them to -- asking them to say and not comfortable with doing it.

COURT: Okay. I am going to ask you one more time. It's a yes or no question. Would you like to stay here and participate in your trial, or would you like to be taken back upstairs?

HURT: I don't want to proceed if I'm not here. I don't know what is going on.

COURT: Well, then you need to stay here. Doesn't that seem like that --

HURT: That's a problem with me staying here though.

COURT: What's the problem?

HURT: I just told you. I keep saying the same thing.

COURT: Well, I'm going to have to disagree with you there, but I'm not going to fight with you over what you think your attorneys are doing, because the last time I checked, you didn't graduate from law school and they did, and they are pretty highly regarded in this courthouse. Are you going to stay or not? Yes or no?

HURT: I keep telling you the same thing.

COURT: Okay. Then take him back upstairs because that's a no to me, to this court. All right. Thank you. We'll continue the trial without you.

**{¶61}** After deputies removed Hurt, his counsel stated that unless Hurt gave an unequivocal "no" on the record, the court needed "to be very careful." The trial court agreed, brought Hurt back to the courtroom, and stated:

COURT: I'll ask you one more time. Do you want to participate in this. It's a yes–

HURT: I just told you.

COURT: Don't tell me you just told me.

HURT: You just keep asking the same thing. I just told you. That's it.

COURT: Mr. Hurt –

HURT: I told you.

COURT: – yes or no, would you like to stay and participate in your trial? Yes or no?

HURT: You told them to take me back.

COURT: Would you like to stay?

HURT: I told you what I said.

CRIMINAL BAILIFF: Yes or no? You need to say yes or you need to say no.

COURT: Okay. Mr. Hurt, I'm going to take your noncompliance --

HURT: I'm uncomfortable.

COURT: No, no. That's okay. I'm going to take your noncompliance with answering the question as a no, and, unless you say yes or no, and tell me affirmatively you want to stay here, I'm going to send you back upstairs and we're going to continue without you. Are you going to give me an affirmative?

HURT: I keep saying the same thing.

COURT: Okay. I will see you later, Mr. Hurt. Thank you for your help.

**{¶62}** The trial court then removed Hurt from the courtroom without any

19

method to remotely view the trial or communicate with counsel. When the jury was seated, the trial court instructed jurors to disregard Hurt's absence. Hurt was not present for the testimony from the eyewitness to Norwood's murder, the phone analyst, the responding officer to Norwood's murder, or the analyst who determined the casings found at the two crime scenes matched those found in the Jeep.

{¶63} Competent, credible evidence supported the trial court's finding that Hurt was voluntarily absent on the fourth day of trial. The trial court's exchange with Hurt began because of Hurt's initial refusal to leave the jail, and Hurt was only present in court because the trial court ordered the deputies to bring Hurt to the courtroom. While generally, a defendant's silence or refusal to answer should not be viewed as a waiver, in this case, the trial court only engaged Hurt in a discussion about whether he wanted to be present because Hurt initially refused to come to court.

{¶64} When asked by the trial court if he wanted to be present, Hurt responded both "proceed," and that he did not want the trial to continue if he was not there. Had that been the extent of Hurt's statements, his absence would have been involuntary. Instead, Hurt conditioned his presence at trial on the trial court acquiescing to his request for new counsel. For example, immediately after Hurt said he wanted to proceed, he continued, "But, like, I don't know what is going on. Like, I'm not comfortable with sitting here and they [his counsel] not doing what I asking them to do." Hurt's conditional statements created the ambiguity that the trial court was seeking to resolve and it was reasonable for it to ask Hurt to provide an unequivocal answer to whether he wanted to attend trial.

{¶65} We find it particularly important that, after the trial court initially removed Hurt, it brought him back to give Hurt another chance to clarify his position.

20

But Hurt continued to refuse to answer yes or no, despite the trial court's indication that absent a clear "yes," it would remove him.

{¶66} Considering Hurt's initial refusal to come to court and refusal to directly answer the trial court's question—did he want to be present for his trial—even after the trial court brought Hurt back, competent, credible evidence supported the trial court's factual finding that Hurt voluntarily waived his right to attend his trial. Accordingly, the trial court did not abuse its discretion by continuing trial without Hurt attending.

b) Day five

{¶67} The next morning, Hurt's counsel addressed the court:

DEFENSE COUNSEL: . . . I asked Mr. Hurt what his position is today as to being here. He said his position was the same as it was yesterday.

COURT: He does not want to be here; is that correct? Mr. Hurt, you have to speak up for the record. Do you want to participate in your defense today?

HURT: I told you yesterday I'm not comfortable with my attorneys and stuff like that so I don't know --

COURT: I'm asking you a yes or no question. Please respond.

HURT: I keep telling you the same thing.

COURT: I got the explanation.

HURT: Ain't nothing else for me to say.

COURT: Yes or no to my question whether you would like to sit today and participate in your trial?

HURT: Told you the same thing yesterday.

COURT: Is that yes or no? Can you please give me a yes or no answer?

HURT: I told you the same thing yesterday.

COURT: Mr. Hurt, we will take you back upstairs. We will proceed with the trial without your presence.

{¶68} The trial court then stated:

Again, today, he didn't refuse to come over, but he did come down and has refused on the record to participate in his defense. So at this time this court has done everything, along with the help of the attorneys and the sheriff's office frankly, to see to it that Mr. Hurt is comfortable and able to participate in his trial; but he is choosing to, for lack of a better word, manipulate the circumstances and will not sit and participate.

{¶69} The trial court instructed the jury not to consider Hurt's absence.

{¶70} Unlike the dialogue from day four, Hurt made no definitive statement that he wanted to be present. Given Hurt's counsel's representation that Hurt's position was "the same as it was yesterday," the trial court's asking Hurt whether he wanted to be present at his trial was reasonable. Considering that the trial court removed Hurt from the courtroom the day before, Hurt's continued refusal to state that he wished to be present constituted waiver.

{¶71} We note that, other than instructing the jury to disregard Hurt's absence, the trial court took no measures to minimize prejudice to Hurt's case. Because the purpose of the right to confrontation is, in part, to facilitate "full and effective cross-examination," *Kentucky v. Stincer*, 482 U.S. 730, 744 (1987), a cautionary instruction to the jury, while important, does not fully protect the interests the right to be present serves. There is no indication that Hurt's counsel was permitted

22

to speak with Hurt on breaks. And the trial court did not facilitate remote viewing. Considering the advances in video conferencing, allowing Hurt to remotely view his trial likely would have caused minimal inconvenience and, with options to mute and hide a participant's screen, no real concern of him disrupting trial proceedings.

{¶72} While the better practice would have been to institute additional safeguards, because that Hurt was voluntarily absent, the trial court's failure to do so did not violate Hurt's constitutional rights. *See State v. Evans*, 2023-Ohio-237, ¶ 34 (5th Dist.) ("Appellant did not have an absolute right to watch the proceedings by video."); *People v. Paige*, 22 N.Y.S.3d 220, ¶ 3 (2015) (stating that while courts should generally permit an excluded defendant to remotely observe the trial, it was not error to deny a request to do so under the facts of the case). The trial court did not abuse its discretion when it continued the trial without Hurt present. We overrule Hurt's second assignment of error.

## C. Third assignment of error: severance

{¶73} Hurt's third assignment of error asserts that the trial court committed plain error when it failed to separate the counts arising from the Llewellyn shooting from those arising from Norwood's murder. A trial court's denial of a motion to sever counts is ordinarily reviewed for an abuse of discretion. *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). But a defendant's failure to renew a motion to sever at the close of the case waives all but plain error. *State v. Jordan*, 2022-Ohio-2566, ¶ 40 (1st Dist.). For Hurt to prevail, he would have to demonstrate the trial court committed an obvious error that affected the outcome of the trial. *State v. Mullins*, 2024-Ohio-421, ¶ 11 (1st Dist.), quoting *State v. Sowders*, 2023-Ohio-4498, ¶ 11 (1st Dist.).

### 1. Joinder and severance

**{¶74}** Crim.R. 8(A) permits a trial court to try multiple offenses in the same trial when the offenses are of "the same or similar character," are connected together or form parts of a common scheme, or are part of a course of conduct. Hurt does not argue that joinder was improper under Crim.R. 8.

**{¶75}** But even if joinder is proper under Crim.R. 8, if joinder of the offenses will prejudice a defendant, the trial court "shall order an election or separate trial of counts, . . . or provide such other relief as justice requires." Crim.R. 14. A defendant moving to sever must demonstrate prejudice by providing the trial court with information sufficient for the trial court to "weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Kennedy*, 2013-Ohio-4221, ¶ 31 (1st Dist.). When the evidence is simple and direct, joinder is not prejudicial. *State v. Johnson*, 2016-Ohio-4934, ¶ 26 (1st Dist.).

**{¶76}** Evidence is simple and direct, causing no prejudice to the defendant, when the evidence is uncomplicated to a degree that a jury can separate the proof required to establish the elements of each offense. *State v. Nitsche*, 2016-Ohio-3170, ¶ 87 (8th Dist.). Requiring the evidence to be simple and direct when joining offenses is intended to "prevent the jury from improperly considering evidence of various crimes as corroborative of each other. The very essence of the rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it." *Id*. If a conviction is the result of the jury combining proof on all offenses and the evidence on each individual count would be insufficient to support all the convictions, joinder was prejudicial. *State v. Echols*, 128 Ohio App.3d 677, 695 (1st Dist. 1998).

## 2. The trial court did not err by trying the counts together

{¶77} The evidence in this case was simple and direct. There were two separate shootings, involving different victims, occurring in different locations, and on different dates. Different eyewitnesses observed and testified about the two shootings. *See State v. Decker*, 88 Ohio App.3d 544, 549 (1st Dist. 1993) ("The factual situation of each crime charged was easy to understand and was capable of segregation since the crimes charged involved different victims, different factual scenarios and different witnesses.").

{¶78} We acknowledge that several witnesses testified about both shootings, including Detective McMenama, the firearms analyst, and the cell-phone analyst. And while the cell-phone and firearm evidence was complex, the ultimate conclusions that these experts offered—Hurt's cell phone was "in the area" of both shootings and shell casings found in the Jeep matched casings found at the scenes of both crimes—were not confusing. *See State v. Marshall*, 2023-Ohio-3542, ¶ 40 (6th Dist.) ("Evidence offered to prove a joined offense may be complex so long as it is not confused with evidence offered to prove the other joined offenses.").

{¶79} The evidence was simple and direct and Hurt has failed to establish prejudice from the joinder of the counts. Because Hurt failed to demonstrate plain error, we overrule his third assignment of error.

## D. Fourth assignment of error: ineffective assistance of counsel

{¶80} In his fourth assignment of error, Hurt argues that he received ineffective assistance of counsel because his attorneys failed to argue the motion to sever. As noted, though Hurt's first set of attorneys moved to sever the counts related to the Llewellyn shooting from the Norwood murder, and his second set of attorneys

adopted that motion, his second set of attorneys failed to renew the motion at trial.

**{¶81}** A licensed attorney is presumed to be competent. *State v. Hamblin*, 37 Ohio St.3d 153 (1988). Accordingly, defendants claiming ineffective assistance of counsel bear the burden of proving their counsel was ineffective. *Id.* Defendants asserting ineffective assistance must show both that their counsel's performance was deficient, and that had counsel been effective, the outcome of the proceedings would have been different. *State v. Johnson*, 2016-Ohio-4934, ¶ 28 (1st Dist.); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984).

**{¶82}** As discussed above, Hurt was not prejudiced by the joinder of the counts related to the two shootings and cannot establish ineffective assistance of counsel. We overrule his fourth assignment of error.

### E. Fifth assignment of error: sufficiency and weight of the evidence

**{¶83}** Hurt argues in his fifth assignment of error that his convictions were based on insufficient evidence and against the manifest weight of the evidence.

#### 1. Sufficiency of the evidence

**{¶84}** A sufficiency-of-the-evidence challenge "tests 'the adequacy of the evidence on each element of the offense.' " *State v. Wright*, 2024-Ohio-851, ¶ 25 (1st Dist.), quoting *State v. Staley*, 2021-Ohio-3086, ¶ 9 (1st Dist.). This court, viewing the evidence in a light most favorable to the state, must determine whether a reasonable fact finder could have found that the state proved beyond a reasonable doubt all the essential elements of each offense. *State v. Kendrick*, 2023-Ohio-1763, ¶ 15 (1st Dist.), citing *State v. MacDonald*, 2019-Ohio-3595, ¶ 12 (1st Dist.). This court does not weigh the evidence and when faced with evidence subject to more than one possible interpretation, we adopt an interpretation of the evidence consistent with the trial

26

court's judgment. *Id.*

**{¶85}** The state argued at trial that Hurt was the person driving the Jeep at both shootings and therefore he was, at a minimum, guilty on a theory of complicity of aggravated murder (Norwood) and attempted murder (A.O. and J.G.).

**{¶86}** R.C. 2923.03(A)(2) provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id and abet another in committing the offense." The state need not charge a defendant under the complicity statute to convict a defendant on a theory of complicity. *State v. Herring*, 94 Ohio St.3d 246, 251 (2002); *see* R.C. 2923.03(F) ("A charge of complicity may be stated in terms of this section, or in terms of the principal offense.").

**{¶87}** To convict a defendant under a theory of aiding and abetting, the state must prove that the defendant " 'supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *State v. McFarland*, 2020-Ohio-3343, ¶ 29, quoting *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. The defendant's intent may be inferred from the surrounding circumstances, including the defendant's presence at the crime scene and conduct before, during, and after the crime. *Johnson* at 245. The presence of the defendant at the scene of the crime alone is not sufficient to prove that the defendant was an accomplice. *Id.* at 245.

a)    Sufficient evidence supported attempted-murder convictions

**{¶88}** As an initial matter, Hurt cites R.C. 2903.02(B), which requires the state to prove a defendant attempted to cause a person's death as a proximate result of an offense of violence. But the indictment lists only R.C. 2903.02(A) in the attempt counts. Accordingly, we will analyze Hurt's sufficiency and manifest-weight

arguments under the portion of the statute under which Hurt was charged in the indictment.

{¶89} To convict Hurt of attempted murder under R.C. 2903.02(A), the state was required to prove beyond a reasonable doubt that Hurt purposely engaged in conduct that, if successful, would have constituted or resulted in the offense of murder, which is defined as purposely causing the death of another. R.C. 2923.02(A); R.C. 2903.02(A).

{¶90} Hurt argues that because there was no evidence that J.G. was harmed, because neither victim testified or participated in the investigation, and because no one specifically identified a shooter, the state failed to sufficiently support the attempted-murder charges. First, the state did not need to demonstrate that either victim suffered any physical harm. It only needed to show that Hurt's conduct, if successful, would have resulted in another person's death. And a defendant may be convicted of murder based on solely circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988). And " '[c]ircumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable.' " *Id.*, quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir. 1974). When the state produces evidence demonstrating that the defendant aided and abetted the person who pulled the trigger, that evidence sufficiently supports an attempted-murder conviction. *State v. Jones*, 2020-Ohio-4915, ¶ 46 (8th Dist.); *see* R.C. 2923.03(C) ("a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.").

{¶91} The eyewitness to the Llewellyn shooting testified that he saw a doorless dark-colored Jeep stop at the corner of Llewellyn and Elmore Street, where J.G., A.O.,

28

and another person were standing. The witness said that two of the Jeep's occupants stood up in the Jeep and fired shots in the direction of the three individuals on the corner. The witness testified that one of the Jeep's occupants wore a red-hooded sweatshirt and black and white slides. Surveillance footage corroborated his testimony. Video of Hurt taken at CVG the day before the shooting showed Hurt wearing similarly colored clothes. A video recovered from Baltimore's phone showed Hurt wearing white-framed glasses similar to those worn by the driver in the surveillance footage. Hurt's phone was in the area of the shooting. Casings recovered from the Jeep matched casings found at the scene of the shooting. The evidence showed that the men on the corner fired back at the Jeep. Video taken after the Llewellyn shooting showed bullet holes in the Jeep. Hurt texted K.F. pictures of damage to the Jeep and paid for repairs. Later, officers found bullet holes in the Jeep had been patched and painted over. Considering this evidence, we hold that a reasonable fact finder could have found that the state proved beyond a reasonable doubt that Hurt attempted to murder J.G. and A.O.

b) <u>Sufficient evidence supported Hurt's aggravated-murder conviction[3]</u>

**{¶92}** To convict Hurt of Norwood's aggravated murder, the state had to prove beyond a reasonable doubt that Hurt, purposely and with prior calculation and design, caused Norwood's death. R.C. 2903.01(A). A person may be convicted of aggravated murder under R.C. 2903.01(A)(1) on a theory of complicity. *State v. Williams*, 2019-Ohio-2734, ¶ 39 (8th Dist.).

**{¶93}** The state presented evidence that occupants of a dark Jeep Wrangler

---

[3] Though Hurt's appellate brief mentions that the state must prove "prior calculation and design," he offered no argument. As such, we decline to address that element of aggravated murder.

shot Norwood. Various videos taken shortly before Norwood's murder showed the Jeep Hurt and K.F. rented. The Jeep drove in and around the South Cumminsville area and then followed Norwood's vehicle toward the scene of the murder. Video from just after the murder showed a similar dark Jeep driving in the direction the eyewitness testified the shooters' Jeep traveled. A video taken from Baltimore's phone minutes before the shooting showed Baltimore and a man in a green hoodie and mask in what appears to be the interior of a Jeep. An officer identified the man in the green hoodie as Hurt. The hoodie resembled a hoodie an unmasked Hurt wore in a different video taken from Baltimore's phone the day before the shooting. Hurt's and Baltimore's cell phones were together during the shooting and were "at or near" the murder location around the time the murder occurred. Shortly after the murder, Hurt's and Baltimore's phones traveled west, which was consistent with the footage of the Jeep driving toward the I-74 West entrance ramp. Finally, a shell casing recovered from the Jeep matched shell casings found at the murder scene.

{¶94} Given the above, the state presented sufficient evidence that Hurt participated in Norwood's murder.

### 2. Hurt's conviction was not against the manifest weight of the evidence

{¶95} A manifest-weight-of-the-evidence challenge argues that the state did not carry its burden of persuasion at trial. *Kendrick*, 2023-Ohio-1763, at ¶ 16 (1st Dist.). In reviewing a conviction under this standard, an appellate court sits "as a 'thirteenth juror' " and must "independently 'review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.' " *State v. Kizilkaya*, 2023-Ohio-3989, ¶ 15 (1st Dist.), quoting *State v. Powell*, 2020-Ohio-4283,

¶ 16 (1st Dist.). Reversal under this standard is reserved for "exceptional cases" in which "the factfinder disregarded or overlooked compelling evidence that weighed against conviction." *Kendrick* at ¶ 16.

**{¶96}** Other than reciting the manifest-weight standard of review and saying that "[h]e was convicted on insufficient lean circumstantial evidence," Hurt fails to develop a manifest-weight argument. For example, Hurt fails to attack the state's witnesses' credibility, argue that the jury drew improper inferences from the evidence, or that the jury improperly resolved disputed evidence. Instead, he only argues that the evidence was insufficient. *See State v. Laws*, 2021-Ohio-166, ¶ 32 (3d Dist.). But sufficiency and weight are separate concepts requiring separate analyses. *Id.* This court need not develop Hurt's manifest-weight argument for him and we decline to do so.

**{¶97}** We overrule Hurt's fifth assignment of error.

### III. Conclusion

**{¶98}** We overrule Hurt's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS** and **BERGERON, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.